*Decision will be entered under Rule 50.*

BLUE DIAMOND COAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 26297, 32935. Filed January 22, 1959.

*George E. H. Goodner*, Esq., *Scott P. Crampton*, Esq., and *Dewey R. Roark, Jr.*, Esq., for the petitioner.

*Edward E. Pigg, Esq.,* and *George J. LeBlanc, Esq.,* for the respondent.

FISHER, *Judge:* These proceedings involve petitioner's claims for refund of excess profits tax under the provisions of section 722 of the Internal Revenue Code of 1939 for the fiscal years ended March 31, 1943, 1944, 1945, and 1946. Also involved are disallowed claims of petitioner for additional exempt excess output credits under the provisions of section 735 for the same fiscal years. The amounts of tax determined by respondent, the amounts of refunds claimed in original and amended claims, and the amount of claims disallowed under section 735 are set forth in our findings, *infra.*

The significant issues are whether (a) petitioner is entitled to relief under section 722 (b) (2) because, beginning immediately prior to and continuing through the base period, its labor costs materially increased due to unionization of its mines, but, as a result of existing competitive conditions, the value of its coal at the mine did not increase correspondingly, and (b) whether petitioner's coal mining properties were in operation, within the meaning of section 735, during periods when such mining properties were closed because of coal strikes.

The instant case was heard by a commissioner of this Court. The Court has considered the record, the proposed findings submitted by the parties, the proposed findings of the commissioner, the proposed additional findings of the parties and their objections to the proposed findings of the commissioner. The Findings of Fact, as found by the Court, are in substance the same as the proposed findings of the commissioner.

### FINDINGS OF FACT.

The petitioner is a corporation incorporated under the laws of the State of Delaware on November 8, 1922. Since its organization and throughout the years here involved, petitioner has been engaged in mining and selling bituminous coal. Its principal office is at Knoxville, Tennessee, and the properties mined by petitioner are located in Kentucky, Tennessee, and Virginia.

Petitioner's books are kept and its Federal income and excess profits tax returns are filed on an accrual basis of accounting for fiscal years ending March 31. Prior to the fiscal year 1937, petitioner filed its returns by calendar years. On March 31, 1936, petitioner, with the approval of respondent, changed its accounting period to the aforementioned fiscal year basis and filed a separate return for the taxable period January 1 to March 31, 1936. All of the tax returns and all of the claims for refund here involved were filed with the then collector of internal revenue for the district of Tennessee.

Petitioner's income tax, declared value excess-profits tax, and excess profits tax liabilities for the fiscal years ended March 31, 1943 to 1946, inclusive, prior to the allowance of any relief under section 722 of the Internal Revenue Code of 1939,[1] have been determined by respondent to be as follows:

| Fiscal year | Income tax | Declared value excess-profits tax | Excess profits tax |
|---|---|---|---|
| 1943 | $239,463.31 | (1) | $747,490.53 |
| 1944 | 247,835.34 | (1) | 801,790.40 |
| 1945 | 254,206.65 | $5,229.78 | 798,615.45 |
| 1946 | 283,943.88 | (1) | 408,405.66 |

[1] None.

All of the taxes shown to be due as aforesaid and any interest due thereon have been paid by petitioner.

In computing its excess profits tax liability for the years involved, petitioner is entitled to use the excess profits credit based on income pursuant to section 713 of the Code. For each of the taxable years involved herein, respondent allowed petitioner an excess profits credit of $471,870.30 under section 713.

Petitioner has filed with respondent several original and revised applications for relief from excess profits taxes under section 722. These applications were all filed, in duplicate, on Treasury Form 991 and sought relief from, or refund of, excess profits taxes by years and in amounts as follows:

| Fiscal year | Designation of claim | Date of filing | Amount of claim |
|---|---|---|---|
| 1941 | Original | Dec. 18, 1941 | $13,309.85 |
| 1941 | Amended | Sept. 14, 1943 | 82,785.70 |
| 1942 | Original | Sept. 14, 1943 | 405,146.83 |
| 1943 | Original | Dec. 15, 1943 | 343,275.40 |
| 1943 | Amended | Dec. 29, 1947 | 144,735.18 |
| 1944 | Original | Dec. 29, 1947 | 152,474.35 |
| 1945 | Original | June 14, 1948 | 202,228.03 |
| 1946 | Original | June 14, 1948 | 136,878.15 |

On April 20, 1944, petitioner filed supplemental information (12 pages) in support of these applications for relief. Subsequently, in the same year, additional information (34 pages) was filed by petitioner in support of these applications for relief. Such 46 pages were attached to and marked Exhibit 1-A of the stipulation of facts.

Each application for relief filed by petitioner for the taxable years 1943 to 1946, inclusive, specifically incorporated therein and made a part thereof all data, material, and information previously submitted for a prior year or years, thereby including the fiscal years 1941 and

[1] Unless otherwise stated herein, all sectional and Code references are to the Internal Revenue Code of 1939, as amended.

1942. Beginning with the amended application for the fiscal year 1941, filed September 14, 1943, each original and each amended application filed thereafter claimed relief under all 5 blocks of Schedule B, Form 991. The reasons advanced for granting relief in each block of the 1941 amended application were: (1) Strikes, floods, and car shortages during the base period interrupted production; (2) coal business was depressed during base period (the specific language of which is set forth in the next paragraph); (3) same reasons as in (2); (4) change in character of business by acquisition of new coal lands and construction of new bridge to facilitate production; and (5) same reasons as in (2), *supra*.

The specific language of block 2, Schedule B, Form 991, of petitioner's 1941 amended application reads as follows:

*Schedule B—Form 991*

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(#2) The coal business as a whole was interrupted in all base period years 1936 through 1939 by a general depression in the industry, which as a whole showed losses from 1931 through 1939. See statistics of National Coal Association and enactment of Bituminous Coal Act, which was passed in 1937 to arrest this depression, and minimum prices set as of October 1, 1940. The Code prices increased the average realization of the Bituminous Coal Industry, according to statistics of the National Coal Association, 11¢ per ton, which increase did not become effective until after the base period years. Because of this depression, it is necessary to substitute 1926, 1927, 1928 and 1929 as base period years.

After petitioner had filed its supplemental information relating to its 1941 and 1942 applications for relief on April 20, 1944, respondent, on June 9, 1944, requested additional information from petitioner which was furnished during 1944 as aforementioned. In rejecting petitioner's applications for relief for the fiscal years 1941 and 1942, respondent considered the additional and supplemental information contained in Exhibit 1–A, which included, among other things, petitioner's average costs, selling prices, and profit or loss per ton for the calendar years 1926 through 1935, and the fiscal years ending March 31, 1936 through 1943, its production costs and administrative and selling expenses (consolidated and by separate mines) for the calendar years 1926 to 1929, inclusive, and its consolidated production costs and administrative and selling expenses for the fiscal years 1937 through 1940.

Following respondent's rejection of its applications for relief for the fiscal years 1941 and 1942, petitioner filed its amended application for relief for fiscal 1943 in which it reasserted its original reasons and amended its 1943 application by adding thereto the following:

As an alternative contention to those set out in the former application for relief, taxpayer submits that the average earning per ton of coal mined prior to January 1, 1936, from all of its mines which were operated during the base period, should

be taken as representative of the profit which would reasonably have been earned in the base period if taxpayer's operations and the industry in general had not been depressed. The ups and downs of the industry and of taxpayer run substantially parallel during that period.

The average profit per ton of coal mined by taxpayer during the said period (January 1, 1922, to December 31, 1935), from its mines which were operated during the base period, was 8.044 cents per ton. (See Schedule 1 hereto attached.) It seems that the average profit per ton realized by taxpayer during the fourteen-year period immediately preceding the base period is the least that could be considered as a normal showing for the base period.

On or about June 22, 1948, petitioner paid $269,977.49 in additional taxes for the fiscal years 1943, 1944, and 1945. On June 1, 1950, petitioner filed refund claims on Treasury Form 843 with respondent with respect to the additional tax payments made in 1948. The excess profits tax refund claimed for each year was as follows:

| Fiscal year ended Mar. 31 | Refund claimed |
|---|---|
| 1943 | $140, 483. 89 |
| 1944 | 133, 442. 63 |
| 1945 | 7, 302. 54 |

Prior to filing the above Form 843 claims and on or about July 19, 1944, petitioner mailed a refund claim on Treasury Form 843 to respondent claiming a refund of excess profits taxes for the fiscal year 1943 in the amount of $386,461.65. Petitioner's retained copy thereof states that "[t]his refund is made part of application for relief under Section 722 of the Internal Revenue Code, Form 991 filed November 30, 1943, and Schedules filed subsequent to that date." The second part of Exhibit 1–A, which was furnished respondent after April 20, 1944, informed him that "[i]n addition, there is filed herewith Claim for Refund, Form 843, covering the year ended March 31, 1943, for all Income and Excess Profits Taxes paid for that year in excess of the amounts due and shown in our computation of the tax shown on page 7." In its amended application for relief for fiscal 1943, filed December 29, 1947, and attached to the petition in Docket No. 26297, petitioner again referred to this claim for refund in the following language: "On July 19, 1944, taxpayer filed a claim for refund (prepared on Form 843) of $386,461.65 of the excess profits tax paid as aforesaid (or any other amount which might be refundable). Said claim was made a part of the application for relief under Section 722 filed November 30, 1943 (see infra). Such claim has not yet been acted upon." Respondent was unable to locate or produce the original of such Form 843 claim and has no record that such a claim was ever filed. Later, petitioner filed Form 843 claims for refund with its second amended returns for the fiscal years 1943, 1944, and 1945. These Form 843 claims dealt with the amount of petitioner's allowable deduction for exempt excess output of coal (see sec. 735

issue, *post*), and petitioner had its retained copies stamped "Received June 22, 1950" by the collector of internal revenue.

Disallowance of petitioner's applications for relief for the taxable years 1943, 1944, and 1945, was recommended by the examining revenue agent who agreed with the reasons given by the Section 722 Field Committee, and by a panel of the Excess Profits Tax Council, for rejecting petitioner's 1941 and 1942 applications. Petitioner filed no protest to the report of the revenue agent since rejection of its 1941 and 1942 applications was based on the same reasons, refused a conference with the Section 722 Field Committee, and refused an oral hearing before the panel. In its letter to the petitioner, dated August 30, 1949, the panel advised that it was sustaining the recommendation of the Section 722 Field Committee and that a statutory notice under section 732 would be issued upon approval by the Executive Committee of the Excess Profits Tax Council. The panel advised petitioner that in order for depressed business conditions to qualify under section 722(b)(2), such depression must be due to temporary and unusual events, and stated that production and average sales prices disclosed that the depression in sales and prices had existed since 1931, which could not be considered temporary or unusual. The panel letter also discussed the replacement of coal by natural gas, oil, and hydroelectric power, and the fact that increasing freight rates during periods of constantly declining demand for coal were contributing factors to the inroads made by gas, oil, and electricity into markets formerly supplied by coal.

The applications for relief filed for the fiscal years ended March 31, 1943, 1944, and 1945, were all considered by respondent on their merits and relief was denied by a registered letter dated September 29, 1949. The application for relief filed for the fiscal year ended March 31, 1946, was considered by respondent on its merits and relief was denied by a registered letter dated December 7, 1950.

The business operated by petitioner was incorporated in 1915 as a Tennessee corporation. In 1922, when petitioner was organized, it took over the business of the Tennessee corporation. The latter was founded by Alexander Bonnyman, who was the ranking officer and active head of the Tennessee corporation and of the petitioner until his death in April 1953. As used herein, the term "petitioner" includes the Tennessee corporation.

On or about November 1, 1926, petitioner took over certain mines which were then being operated by different corporations. The directors and stockholders of the petitioner and these corporations were about the same. Capital stock was issued by petitioner in acquiring the assets of the various companies. After the consolidation was completed, petitioner was capitalized at $5,500,000, with a writeup in

values of $2,825,000. The officers and directors of the petitioner were substantially the same from its incorporation until after the end of the base period. Except for its sales policies, hereinafter discussed, petitioner made no material changes in its policies during the base period years as compared with years prior and subsequent thereto.

From January 1, 1922, to December 31, 1926, the Blue Diamond Coal Sales Company sold the coal produced by petitioner and the companies acquired in 1926. The stock of this Sales Company was owned principally by the employees, officers, and directors of that company. On or about January 1, 1927, petitioner acquired the assets of the Sales Company, issuing $120,000 of petitioner's capital stock to the Sales Company's stockholders for their interests. After January 1, 1927, and until about March 1933, the sale of coal was handled by a department of the petitioner using the same personnel. In March of 1933, petitioner, in order to become a member of Appalachian Coals, Inc., a marketing agency, incorporated another Blue Diamond Coal Sales Company, a Delaware corporation, with a capitalization of $5,000. All of the capital stock of this second Sales Company was owned by petitioner. The operations of the Sales Company since March 1933 have been financed by petitioner as the Sales Company had insufficient capital to carry accounts receivable running up to around $2,000,000.

The headquarters of the 1933 Sales Company was located in Cincinnati, Ohio. During the base period, it had sales offices in Chicago, Illinois, Minneapolis, Minnesota, Knoxville, Tennessee, Atlanta, Georgia, and Spartanburg, South Carolina. In the fall of 1936, an office was opened in Detroit, Michigan. The sales organization was divided into 3 divisions, South, Central, and Western, with a sales manager over each division who reported to the vice president in charge of sales in Cincinnati.

During the base period, petitioner's coal was sold net 10th of the month following shipment by rail; on lake coal, the sale was net 60 days from vessel bill of lading. No discounts were given.

The net income of the first Blue Diamond Coal Sales Company for the calendar years 1922 to 1926, inclusive, and of the second Blue Diamond Coal Sales Company from April 15, 1933, to March 31, 1940, for the periods indicated, was as follows:

FIRST SALES COMPANY

| Period | Net income |
|---|---|
| 1922 | $55,648 |
| 1923 | 13,198 |
| 1924 | 24,948 |
| 1925 | 50,870 |
| 1926 | 110,261 |

SECOND SALES COMPANY

| Period | Net income |
|---|---|
| Apr. 15–Dec. 31, 1933 | $6, 813 |
| 1934 | 33, 605 |
| 1935 | 51, 915 |
| Jan. 1–Mar. 31, 1936 | 45, 883 |
| Fiscal year 1937 | 52, 005 |
| Fiscal year 1938 | 49, 146 |
| Fiscal year 1939 | 1, 499 |
| Fiscal year 1940 | 18, 852 |

The second Sales Company filed its own income and excess profits tax returns during the base period and the taxable years.

In or about 1922 in an effort to keep its production and sales in the proper balance, petitioner began its so-called "lake cargo" or "dock coal" business, which has helped it materially to increase the running time of its mines. During the spring, summer, and fall months when ships can navigate on the Great Lakes, petitioner ships domestic coal to lake ports such as Toledo, Sandusky, and Lorain. The coal is loaded into boats and carried to various docks at the head of the lakes, such as Lancaster, Duluth, and Superior. There, it is stored by the retail yards until needed.

The lake cargo business is primarily a summer operation when demand for domestic coal for home use is at a minimum. This business has enabled petitioner to sell domestic coal in the summer at the same time that it is furnishing steam coal to industrial buyers. From a small beginning of 40,000 or 50,000 tons of lake cargo coal business a year, petitioner has increased its annual shipments to nearly a million tons in late years, with 277,373 tons being shipped in the calendar year 1938, and 273,924 tons in calendar 1939.

Petitioner contracts with the dock buyers in the spring for certain tonnages and delivers the coal throughout the dock season as boats are available. As is typical of most businesses, dock coal is generally lower in price because of the large volume and is not as expensive to sell as other coal because one sale consummated in the spring may cover shipments for 7 or 8 months and amounting to tens of thousands of tons.

Prior to and during the base period, petitioner specialized in producing premium domestic coal, which was used in heating homes. It has always been known as one of the largest shippers of quality domestic coal from the southern fields. It also produced steam or industrial coal, the principal buyers of which were railroads, public utilities, and general industry. The coal was of various sizes and classifications, including block, chunk, egg, nut, slack, and stoker, and was high volatile coal.

Petitioner sold its coal from the Dakotas in the North to Florida in the South, and from the Mississippi River to the eastern slope of

the Appalachians. Its actual sales area was fixed primarily by its competitive freight rates. Petitioner also shipped small amounts of coal to Massachusetts, Kansas City, and the west coast. The demand for coal in the Northwest has always been for the larger block sizes, and petitioner's coal was adaptable to this market. Its Blue Diamond mine produced a very hard structure coal, about 40 per cent of which was block coal. Similarly, its Bonny Blue and Mayflower mines produced almost 40 per cent block coal, its Eagan and Westbourne mines, 30 to 35 per cent block coal, and its Crown mine around 20 per cent block coal. It was an advantage pricewise for petitioner to produce a large percentage of block coal.

The mines operated by petitioner were in mountainous country, and the railroads reached them usually by going up narrow gorges. There was little or no room at the mines for storing, other than in coal cars. During the base period and the taxable years, petitioner was unable to store much coal. When it had coal that could not be sold, petitioner had to stop mining temporarily. It did not make a practice of meeting distress coal prices, i.e., selling at some price that would dispose of the coal.

The coal mined by petitioner is run over a tipple which separates the various sizes of coal. The coal may be graded into as many as 10 or 12 different sizes from the large block sizes seen around farm houses down to the pulverized steam coal used by industrial plants. One of the problems in operating a mine is to continue to sell each of these sizes of coal as it is being produced. A failure to do so results in the tipple tracks being loaded with coal cars full of the unsold sizes which may in turn force a shutdown of the mine.

The original Blue Diamond mine was built in 1915 for an output of 300,000 tons per year. The mines owned by petitioner, the year opened or acquired, and their locations are as follows:

| Name of mine | Year | Location | Name of mine | Year | Location |
|---|---|---|---|---|---|
| Blue Diamond | 1922 | Kentucky. | Path Fork | 1940 | Kentucky. |
| Crown | 1926 | Kentucky. | Imperial | 1941 | Virginia. |
| Westbourne | 1926 | Tennessee. | Monarch | 1941 | Virginia. |
| Eagan | 1926 | Tennessee. | Toms Creek | 1941 | Virginia. |
| Liberty | 1926 | Kentucky. | Fork Ridge | 1942 | Tennessee. |
| Sapphire | 1926 | Kentucky. | Leatherwood No. 1 | 1942 | Kentucky. |
| Bonny Blue | 1926 | Virginia. | Royal Blue | 1943 | Tennessee. |
| Mayflower | 1929 | Virginia. | Leatherwood No. 2 | 1949 | Kentucky. |

Prior to 1949, all of the above mines were in operation except Sapphire and Liberty which had been mined out and closed in 1932 and 1933, respectively. In 1943, petitioner ceased mining Bonny Blue to protect the haulways through which the coal from its Mayflower mine was hauled. Subsequent to 1949, several of the mines owned by petitioner were closed because the coal was exhausted or

because conditions in the mine became such that the coal was no longer "mineable and merchantable."

Before, during, and after the base period, petitioner acquired and developed additional coal lands in connection with its mines. Additional coal lands were leased at the Bonny Blue mine in September 1935, at the Blue Diamond mine in July 1936, and at the Eagan mine in October 1939. A large tract of coal land adjoining the Blue Diamond mine was leased by petitioner in April 1940. Petitioner had explored the latter property during 1939, while it held an option thereon. This tract increased petitioner's estimated coal reserves by 10,000,000 tons and was connected to the Blue Diamond mine by a large steel trestle that petitioner built across a gorge. After 1940, petitioner continued negotiating for and acquiring additional coal lands.

From time to time during their operations petitioner's engineering and operating departments estimated the amount of coal reserves in their various mines. These estimates varied as coal was mined, conditions within the mine changed, and additional coal lands were acquired. Conditions encountered within the mine which caused petitioner's personnel to revise and adjust previous estimates included changes in the thickness of the coal seam, disappearance of a coal seam due to faults in the geological structure, and more, or less, impurities in a coal seam than anticipated. The following table shows petitioner's estimated reserves, its actual production as compared with the production of the bituminous coal industry, and the percentage of petitioner's production to industry's production, by calendar years, from 1922 through 1949.

| Year | Estimated reserves | Petitioner's production | Industry production | Petitioner's per cent of industry |
|---|---|---|---|---|
| | Tons | Tons | 1,000 tons | |
| 1922 | 36,391,003 | 799,989 | 422,268 | 0.189 |
| 1923 | 48,944,495 | 883,273 | 564,565 | .156 |
| 1924 | 49,441,103 | 1,280,755 | 483,687 | .265 |
| 1925 | 47,572,746 | 1,873,365 | 520,053 | .360 |
| 1926 | 51,790,188 | 2,235,913 | 573,367 | .310 |
| 1927 | 49,636,798 | 2,153,026 | 517,763 | .416 |
| 1928 | 45,856,030 | 2,412,044 | 500,745 | .482 |
| 1929 | 42,719,101 | 2,383,649 | 534,989 | .446 |
| 1930 | 60,849,113 | 2,280,815 | 467,526 | .488 |
| 1931 | 61,557,003 | 2,037,356 | 382,089 | .533 |
| 1932 | 59,877,139 | 1,681,286 | 309,710 | .543 |
| 1933 | 56,258,483 | 1,572,496 | 333,631 | .472 |
| 1934 | 66,236,402 | 1,588,898 | 359,368 | .442 |
| 1935 | 60,739,236 | 1,846,374 | 372,373 | .496 |
| 1936 | 55,360,103 | 2,503,052 | 439,088 | .570 |
| 1937 | 49,654,407 | 2,517,972 | 445,531 | .565 |
| 1938 | 47,497,273 | 2,157,134 | 348,545 | .619 |
| 1939 | 44,551,954 | 2,357,087 | 394,855 | .597 |
| 1940 | 50,405,553 | 2,698,291 | 460,772 | .586 |
| 1941 | 86,044,159 | 3,458,046 | 514,149 | .673 |
| 1942 | 85,308,517 | 4,316,660 | 582,693 | .741 |
| 1943 | 129,560,407 | 4,242,131 | 590,177 | .719 |
| 1944 | 143,594,712 | 3,891,511 | 619,576 | .628 |
| 1945 | 140,020,377 | 3,036,431 | 577,617 | .526 |
| 1946 | 139,550,163 | 2,865,752 | 533,922 | .537 |
| 1947 | 135,933,298 | 3,691,474 | 630,624 | .585 |
| 1948 | 118,744,115 | 3,789,457 | 599,518 | .632 |
| 1949 | 146,174,221 | 2,522,739 | 437,868 | .576 |

The Bituminous Coal Act of 1937 designated the coal-producing area in which petitioner's mines were located as District 8, Price Area I. Such district covered mines located in southern West Virginia, eastern Kentucky, part of eastern Tennessee, southwestern Virginia, and a small area in North Carolina. Underground mines produced most of the coal in District 8; very little coal was produced therein by strip mining. The following table shows that District 8 gradually increased its proportion of the total United States bituminous coal production from 1923 to 1949, inclusive:

| Calendar year | Production District 8 | Percentage of United States production | Calendar year | Production District 8 | Percentage of United States production |
|---|---|---|---|---|---|
| | *Tons* | | | *Tons* | |
| 1923 | 80, 668, 418 | 14. 29 | 1937 | 91, 874, 221 | 20. 62 |
| 1924 | 82, 997, 978 | 17. 16 | 1938 | 74, 486, 913 | 21. 37 |
| 1925 | 100, 394, 421 | 19. 30 | 1939 | 84, 209, 851 | 21. 33 |
| 1926 | 112, 292, 354 | 19. 58 | 1940 | 97, 696, 336 | 21. 20 |
| 1927 | 113, 641, 978 | 21. 95 | 1941 | 108, 505, 500 | 21. 10 |
| 1928 | 103, 279, 890 | 20. 63 | 1942 | 121, 509, 227 | 20. 85 |
| 1929 | 105, 422, 812 | 19. 71 | 1943 | 122, 015, 413 | 20. 67 |
| 1930 | 93, 045, 272 | 19. 90 | 1944 | 126, 403, 000 | 20. 40 |
| 1931 | 76, 564, 304 | 20. 04 | 1945 | 116, 749, 000 | 20. 21 |
| 1932 | 63, 473, 845 | 20. 50 | 1946 | 114, 256, 000 | 21. 40 |
| 1933 | 67, 821, 692 | 20. 33 | 1947 | 142, 608, 000 | 22. 61 |
| 1934 | 72, 203, 099 | 20. 09 | 1948 | 137, 706, 000 | 22. 97 |
| 1935 | 75, 393, 533 | 20. 25 | 1949 | 102, 695, 000 | 23. 45 |
| 1936 | 90, 860, 655 | 20. 70 | | | |

During the same period, petitioner's percentage of District 8's production increase from 1.09 per cent in 1923 to a high of 3.55 per cent in 1942. During the calendar years 1936 to 1939, inclusive, such percentage was 2.75, 2.74, 2.90, and 2.80, respectively.

During World War I, most of the bituminous coal mines in the North and in the South operated under contracts with labor unions. In 1922, there was a breakdown of this union control in the southern mining regions including District 8. The southern mines acquired a definite economic advantage through this breakdown of union control in the form of lower labor costs. With such an advantage, the southern mines were able to capture parts of the market previously served by northern mines which continued operating under union contracts. By 1925, the competitive situation was so difficult that a number of northern operators broke away from the overall union contracts covering the northern operating fields. In the major coal strike of 1927, quite a number of northern operators broke away from the union contracts with the idea of removing labor costs as a competitive factor. By 1930, the United Mine Workers organization was in a weak position in the bituminous coal industry, its membership was low, and such limited strength as it had was almost entirely in the anthracite field. With the adoption of the Bituminous Coal Code in 1933 under NRA, the bituminous coal industry was unionized in a

very short time, and this situation continued through and beyond the base period.

Petitioner's mines operated under union contracts until about March 31, 1922, when their union contract expired. When petitioner and the miners were unable to agree on a new contract, a strike occurred. After 6 months, the miners returned to work without a contract. Thereafter, the union lost strength and petitioner operated without a union contract until 1933. Except for its Crown mine, which paid the union scale of wages but did not have a union contract until about 1935, petitioner's mines have operated under union contracts since 1933. Petitioner's changing wage scale under union and nonunion operating conditions is illustrated by the following hourly wage paid slate pickers and blacksmiths at its Blue Diamond mine:

| Date | Slate pickers hourly wage | Black-smith hourly wage | Date | Slate pickers hourly wage | Black-smith hourly wage |
|---|---|---|---|---|---|
|  | Cents | Cents |  | Cents | Cents |
| Dec. 16, 1921 | 35 | 64 | June 1, 1933 | 22. 5 | 44 |
| Aug. 16, 1922 | 50 | 90 | Sept. 30, 1933 | 32. 5 | 53 |
| Jan. 1, 1924 | 40 | 62. 5 | Oct. 1, 1933 | 32. 5 | 62. 5 |
| Nov. 1, 1931 | 28 | 56 | Apr. 1, 1934 | 42. 8 | 77. 1 |
| Dec. 1, 1931 | 25 | 50 | Oct. 1, 1935 | 50 | 84. 33 |
| Apr. 1, 1933 | 20 | 40 | Apr. 1, 1937 | 57. 1 | 91. 4 |

The principal change that occurred in wages and hours in the bituminous coal mines in the Appalachian area from the time the union contracts were signed in 1933 until the end of the base period, was the adoption of the 7-hour day on April 1, 1934, instead of the 8-hour day, but at the same daily pay plus 40 cents. There were also additional raises of 50 cents per day each on October 1, 1935, and April 1, 1937. Similar changes were made for piece-rate workers. The 40-cent per day wage differential which had existed in favor of the southern mines was eliminated on April 1, 1941, when an industry-wide contract was signed.

In an effort to improve their competitive position the northern mines, in the late 1920's and the early 1930's, began to increase their use of mechanical equipment. The early developments in mechanical loading equipment were primarily for operations in thick seams of coal, i.e., seams of coal in excess of 60 inches in thickness. Prior to 1939, there was virtually no mechanical loading equipment suitable for mining thin coal seams, i.e., 48 inches or less in thickness. Before and during the base period, petitioner's mines were hand-loading mines. Leatherwood was petitioner's first completely mechanized mine.

The growth of mechanization in deep-mined bituminous coal during the years 1933 to 1938, is illustrated in the following percentages of production of coal mechanically loaded in the principal northern and southern coal-producing States:

| Year | Northern States | | | | Southern States | | | |
|---|---|---|---|---|---|---|---|---|
| | Ill. | Ind. | Ohio | Pa. | Ky. | Tenn. | Va. | W. Va. |
| | *Per cent* | *Per cent* | *Per cent* | *Per cent* | *Per cent* | *Per cent* | *Per cent* | *Per cent* |
| 1933 | 53.9 | 48.6 | 5.5 | 8.5 | 2.2 | (1) | 4.5 | 0.8 |
| 1934 | 52.6 | 61.4 | 5.8 | 7.3 | 1.9 | (1) | 4.1 | 1.4 |
| 1935 | 55.3 | 62.5 | 7.8 | 7.1 | 1.3 | 5.6 | 6.7 | 2.1 |
| 1936 | 62.4 | 70.5 | 9.5 | 8.3 | 1.4 | 5.7 | 6.7 | 7.4 |
| 1937 | 70.6 | 78.3 | 14.1 | 10.9 | 2.8 | 8.6 | 10.9 | 13.1 |
| 1938 | 74.5 | 81.1 | 24.1 | 15.8 | 8.6 | 12.2 | 15.0 | 22.1 |

1 Not available.

The growth of mechanical loading at underground bituminous mines in the United States as a whole for the period 1933 to 1939, inclusive, is reflected in the following percentages of mechanically loaded coal: 1933—12; 1934—12.2; 1935—13.5; 1936—16.3; 1937—20.2; 1938—26.7; 1939—31.0.

Freight rates on coal from the mine to its destination determine the market areas in which a coal mine can sell its coal. Some mines can ship in one direction but not in another. During the base period, petitioner's Virginia mines had a freight disadvantage of 5 to 25 cents a ton on coal moving north. On southbound shipments, such mines enjoyed freight advantages over other mines of the petitioner. The Blue Diamond mine could not ship coal south on a competitive freight rate, except to one point, nor could it ship coal into the Carolinas. On an average, freight constituted about 50 per cent of the cost of the coal to the ultimate consumer.

One of the most significant indicators of the economic condition of the bituminous coal-mining industry is the extent to which the operating capacity of the existing mines was used in actual production. The following table shows the annual production of coal and lignite in the United States, the capacity of the mines operating at 280 days annually, and the percentage that actual production was of capacity for the period 1922 to 1949, inclusive:

| Year | Production | Capacity | Production as percentage of capacity | Year | Production | Capacity | Production as percentage of capacity |
|---|---|---|---|---|---|---|---|
| | *Millions of tons* | *Millions of tons* | | | *Millions of tons* | *Millions of tons* | |
| 1922 | 422 | 832 | 50.8 | 1936 | 439 | 618 | 71.0 |
| 1923 | 564 | 885 | 63.8 | 1937 | 445 | 646 | 69.0 |
| 1924 | 483 | 792 | 61.1 | 1938 | 348 | 602 | 57.9 |
| 1925 | 520 | 748 | 69.5 | 1939 | 394 | 621 | 63.6 |
| 1926 | 573 | 747 | 76.8 | 1940 | 460 | 639 | 72.1 |
| 1927 | 517 | 759 | 68.2 | 1941 | 514 | 666 | 77.1 |
| 1928 | 500 | 691 | 72.5 | 1942 | 582 | 663 | 87.9 |
| 1929 | 534 | 679 | 78.8 | 1943 | 590 | 626 | 94.2 |
| 1930 | 467 | 700 | 66.8 | 1944 | 619 | 624 | 99.1 |
| 1931 | 382 | 669 | 57.1 | 1945 | 577 | 620 | 93.2 |
| 1932 | 309 | 594 | 52.1 | 1946 | 533 | 699 | 76.3 |
| 1933 | 333 | 559 | 59.7 | 1947 | 630 | 755 | 83.5 |
| 1934 | 359 | 565 | 63.6 | 1948 | 599 | 774 | 77.5 |
| 1935 | 372 | 582 | 64.0 | 1949 | 437 | 781 | 56.0 |

The average percentage that actual production was to capacity for stated periods during the 50 years 1900 to 1949, was as follows: For the base period 1936 to 1939, 65.4 per cent; for the 14 years before the base period, 1922 to 1935, 64.6 per cent; for the 18 years, 1922 to 1939, 64.8 per cent; for the 22 years, 1900 to 1921 (not tabulated above), 77.9 per cent; for the 36 years, 1900 to 1935, 72.7 per cent; and for the 50 years, 1900 to 1949, 73.9 per cent.

The consumption of bituminous coal and lignite in the United States, by principal consumers including retail deliveries, for the years 1933 to 1953, inclusive, in millions of net tons, was as follows:

| Year | Electric power utilities | Railroads (class I) | Coke plants, ovens | Steel and rolling mills | Retail deliveries[1] |
|---|---|---|---|---|---|
| 1933 | 27 | 72 | 38 | 10 | 80 |
| 1934 | 29 | 76 | 44 | 10 | 86 |
| 1935 | 30 | 77 | 49 | 11 | 83 |
| 1936 | 38 | 86 | 63 | 13 | 84 |
| 1937 | 41 | 88 | 69 | 12 | 80 |
| 1938 | 36 | 73 | 45 | 8 | 68 |
| 1939 | 42 | 79 | 61 | 9 | 71 |
| 1940 | 49 | 85 | 76 | 10 | 87 |
| 1941 | 59 | 97 | 82 | 10 | 97 |
| 1942 | 63 | 115 | 87 | 10 | 104 |
| 1943 | 74 | 130 | 90 | 11 | 122 |
| 1944 | 76 | 132 | 94 | 10 | 124 |
| 1945 | 71 | 125 | 87 | 10 | 121 |
| 1946 | 68 | 110 | 76 | 8 | 100 |
| 1947 | 86 | 109 | 94 | 10 | 99 |
| 1948 | 95 | 94 | 96 | 10 | 89 |
| 1949 | 80 | 68 | 85 | 7 | 90 |
| 1950 | 88 | 60 | 94 | 7 | 86 |
| 1951 | 101 | 54 | 102 | 7 | 76 |
| 1952 | 103 | 37 | 90 | 6 | 68 |
| 1953[2] | 112 | 27 | 104 | 6 | 61 |

[1] Deliveries of coal by retail dealers first published by Bureau of Mines in 1933.
[2] Preliminary.

Petitioner was selling its premium coals primarily to the retail dealers for domestic use by householders, apartments, office buildings, and small businesses. The low retail sales in the base period years, 1936–1939, inclusive, increased the competition among coal operators and tended to reduce the amount realized on the tonnage sold. Petitioner reduced its prices now and then to hold a highly competitive piece of business but it did not meet its competitors' distress coal prices. During this period of low retail deliveries, the Blue Diamond Coal Sales Company, which sold petitioner's production, increased its sales force from 13 salesmen in 1935 to 24 salesmen in 1939, and substantially increased the tonnage sold.

Prior to, during, and after the base period, the bituminous coal industry was made up of hundreds of producing companies located in different parts of the country and operating under different physical and natural conditions. These companies competed against each other in the market, where freight costs and other economic factors permitted, although their size, the type of coal, the methods of operation, and their labor conditions varied. The coal companies also

encountered increasing competition from petroleum, natural gas, and water power. Pipeline transportation facilities enabled oil and gas to invade markets formerly served by coal. The amount of coal displaced by these competing mineral fuels and by water power cannot be determined, but the increasing use of oil, gas, and water power, as a supplier of energy, and the decline of bituminous coal as the major supplier of such energy, is demonstrated by the following table which shows the relative percentages of energy supplied by each at stated dates (anthracite coal and petroleum imports account for the remaining percentages of mineral fuels supplying energy):

| Year | Bituminous coal and lignite | Domestic production of petroleum [1] | Natural gas [2] | Water power |
|---|---|---|---|---|
| | Per cent | Per cent | Per cent | Per cent |
| 1900 | 70.5 | 4.7 | 3.2 | 3.2 |
| 1936 | 50.9 | 28.2 | 10.3 | 3.6 |
| 1937 | 48.6 | 30.9 | 10.8 | 3.6 |
| 1938 | 43.8 | 33.8 | 11.9 | 4.2 |
| 1939 | 45.6 | 32.3 | 11.7 | 3.7 |
| 1949 | 35.9 | 33.4 | 18.2 | 4.8 |

[1] More than half used in the form of gasoline, kerosene, and lubricants.
[2] Nearly half used in field for drilling or operating oil and gas wells and pipelines, or for the manufacture of carbon black.

The following table compares industry's average value per ton of coal at the mine and average labor costs per ton with petitioner's average selling price and labor costs per ton for the period 1922 to 1949, inclusive:

| Calendar year | Industry | | Petitioner [1] | |
|---|---|---|---|---|
| | Average value | Average labor costs | Average selling price | Average labor costs |
| | Per ton | Per ton | Per ton | Per ton |
| 1922 | $3.02 | $1.811 | $2.8227 | $1.337 |
| 1923 | 2.68 | 1.732 | 2.8703 | 1.667 |
| 1924 | 2.20 | 1.636 | 1.982 | 1.1543 |
| 1925 | 2.04 | 1.623 | 1.9169 | 1.0519 |
| 1926 | 2.06 | 1.604 | 2.018 | 1.035 |
| 1927 | 1.99 | 1.514 | 2.007 | 1.130 |
| 1928 | 1.86 | 1.386 | 1.7631 | 1.0263 |
| 1929 | 1.78 | 1.292 | 1.7767 | 1.0865 |
| 1930 | 1.70 | 1.244 | 1.6442 | 1.0529 |
| 1931 | 1.54 | 1.164 | 1.3450 | .8633 |
| 1932 | 1.31 | .911 | 1.1170 | .7000 |
| 1933 | 1.34 | .958 | 1.2921 | .7701 |
| 1934 | 1.75 | 1.267 | 1.8271 | 1.1033 |
| 1935 | 1.77 | 1.330 | 1.8478 | 1.1444 |
| 1936 | 1.76 | 1.400 | 1.9622 | 1.1962 |
| 1937 | 1.94 | 1.486 | 1.8483 | 1.2143 |
| 1938 | 1.95 | 1.456 | 2.0587 | 1.3323 |
| 1939 | 1.84 | 1.422 | 1.9317 | 1.3138 |
| 1940 | 1.91 | 1.373 | 1.9881 | 1.3018 |
| 1941 | 2.19 | 1.523 | 2.0876 | 1.2639 |
| 1942 | 2.36 | 1.609 | 2.5039. | 1.5415 |
| 1943 | 2.69 | 1.695 | 2.6486 | 1.6174 |
| 1944 | 2.92 | 1.747 | 3.0198 | 1.8795 |
| 1945 | 3.06 | 1.759 | 3.2881 | 2.0489 |
| 1946 | 3.44 | 1.911 | 3.4396 | 2.2165 |
| 1947 | 4.16 | 2.092 | 3.9972 | 2.7154 |
| 1948 | 4.99 | 2.393 | 5.1995 | 3.0373 |
| 1949 | 4.88 | 2.281 | 6.2680 | 3.5338 |

[1] Calendar years through Dec. 31, 1935; 3 months ending Mar. 31 for 1936; thereafter fiscal years ending Mar. 31.

The average hourly earnings of all bituminous coal-mining employees, as reported by the Bureau of Labor Statistics, Department of Labor, for the years 1923 to 1949, inclusive, show the following changes before and after unionization of the industry in 1933:

| Calendar year | Average hourly earnings | Index (1926 = 100) | Calendar year | Average hourly earnings | Index (1926 = 100) |
|---|---|---|---|---|---|
| 1923 | $0.845 | 108 | 1937 | $0.856 | 109 |
| 1924 | .813 | 103 | 1938 | .878 | 112 |
| 1925 | .800 | 102 | 1939 | .886 | 113 |
| 1926 | .786 | 100 | 1940 | .883 | 113 |
| 1927 | .751 | 96 | 1941 | .993 | 126 |
| 1928 | .716 | 91 | 1942 | 1.059 | 135 |
| 1929 | .681 | 87 | 1943 | 1.139 | 145 |
| 1930 | .684 | 87 | 1944 | 1.186 | 151 |
| 1931 | .647 | 82 | 1945 | 1.240 | 158 |
| 1932 | .520 | 66 | 1946 | 1.401 | 178 |
| 1933 | .501 | 64 | 1947 | 1.636 | 208 |
| 1934 | .673 | 86 | 1948 | 1.898 | 241 |
| 1935 | .745 | 95 | 1949 | 1.941 | 248 |
| 1936 | .794 | 101 | | | |

The increase in average hourly wages in industry in 1933 and 1934 brought no corresponding increase in productivity per man per day. The following table shows output per man per day in the 3 States in which petitioner was mining, Kentucky, Tennessee, and Virginia, similarly for the industry in the United States, and a comparison in terms of percentages of the 3-State output with industry's output:

| Calendar year | 3-States total | United States | 3-States of United States | Calendar year | 3-States total | United States | 3-States of United States |
|---|---|---|---|---|---|---|---|
| | Tons | Tons | Per cent | | Tons | Tons | Per cent |
| 1923 | 4.37 | 4.42 | 98.9 | 1935 | 4.09 | 4.32 | 94.7 |
| 1924 | 4.31 | 4.50 | 95.8 | 1936 | 4.15 | 4.42 | 93.9 |
| 1925 | 4.32 | 4.44 | 97.3 | 1937 | 4.23 | 4.46 | 94.8 |
| 1926 | 4.27 | 4.42 | 96.6 | 1938 | (1) | 4.60 | 96.5 |
| 1927 | 4.32 | 4.46 | 96.9 | 1939 | (1) | 4.93 | 92.7 |
| 1928 | 4.47 | 4.61 | 97.0 | 1940 | 4.36 | 4.87 | 89.5 |
| 1929 | 4.42 | 4.72 | 93.6 | 1941 | 4.30 | 4.83 | 89.0 |
| 1930 | 4.66 | 4.92 | 94.7 | 1942–45 | (1) | (1) | (1) |
| 1931 | 5.02 | 5.12 | 98.1 | 1946 | 4.92 | 5.43 | 90.6 |
| 1932 | 5.10 | 4.99 | 102.2 | 1947 | 5.26 | 5.49 | 95.8 |
| 1933 | 4.65 | 4.61 | 100.9 | 1948 | 5.16 | 5.31 | 97.3 |
| 1934 | 4.10 | 4.23 | 96.9 | 1949 | 5.25 | 5.42 | 96.9 |

[1] Not available.

At all times material, petitioner had net income from sources other than coal. Such net income included rents, commissary profits, interest, dividends, and other income. Except for 1922 and 1926, petitioner's net income from other sources exceeded its net income from coal for all taxable periods from 1922 to the fiscal year 1941, inclusive. For the 14 years prior to its base period, petitioner's production averaged 1,786,916 tons of coal annually and its net income

therefrom averaged 7.24 cents per ton compared with an average of 19.22 cents per ton from other sources of income during the same period. Adjustments for various years in such period increased petitioner's average net income from coal to 8.67 cents per ton and reduced its average net income from other sources to 18.89 cents per ton. Coal income was adjusted by adding the net income of the first Sales Company for the years 1922–1926, inclusive, by adding the net income of the second Sales Company for the years 1933–1935, inclusive, and by adding the interest paid to petitioner in 1935 by the second Sales Company. Petitioner's other income was adjusted downward by dividend adjustments for the years 1933–1935, inclusive, and an interest adjustment for 1935. Additional adjustments by revenue agents increased petitioner's adjusted income for each year and increased its average income per ton for the period to 28.99 cents per ton.

During its base period, January 1, 1936, to March 31, 1940, petitioner's production averaged 2,417,221 tons of coal annually and its loss thereon averaged 2.92 cents per ton compared with an average income of 23.33 cents per ton from other sources. After adjustments similar to those heretofore mentioned for the pre-base-period years, petitioner's net income from coal averaged a little over one-half cent a ton, namely, 0.58 cents, and its other income averaged 20.08 cents per ton, or a total of 20.66 cents per ton. After adjustments by revenue agents for each year, petitioner's average income per ton was 21.09 cents.

For each of the 10 fiscal years following the base period, petitioner realized a substantial net income from coal and from its other sources of income. Its production averaged 3,434,824 tons annually and its net income averaged 44.09 cents per ton on coal and 18.09 cents per ton from other sources. After all adjustments, including revenue agent adjustments for each year except fiscal 1950, which adjustment has not been settled, petitioner's average income per ton for the 10 fiscal years was 66.47 cents. The detailed figures with respect to the facts summarized in this paragraph and the preceding two paragraphs are contained in Exhibit 96, which is incorporated herein by reference.

The following table shows petitioner's average annual net income after revenue agent adjustments and its average annual excess profits net income for the period 1922 through 1935 and for the base period:

| | Annual average after R. A. R. adjustments | Annual average E. P. N. I. |
|---|---|---|
| 1922–1935, incl | $498,425.08 | $500,836.00 |
| Base period | 503,738.90 | 455,460.88 |

Petitioner sold its coal from 1922 to 1927 through a sales company, then through its own sales department until 1934, and thereafter

through a second sales company, wholly owned by petitioner. The net income of the sales companies during and prior to the base period is shown on pages 783 and 784, *supra*. The selling expenses per ton for each sales organization were as follows:

| First Sales Company | | Petitioner's sales department | | Second Sales Company | |
|---|---|---|---|---|---|
| Year | Selling expenses | Year | Selling expenses | Year | Selling expenses |
| | Per ton | | Per ton | | Per ton |
| 1922 | $0.162 | 1927 | $0.110 | 1934 | $0.163 |
| 1923 | .187 | 1928 | .109 | 1935 | .148 |
| 1924 | .164 | 1929 | .106 | 1936 (3 mo.) | .189 |
| 1925 | .147 | 1930 | .113 | 1937 F/Y | .147 |
| 1926 | .151 | 1931 | .129 | 1938 F/Y | .177 |
| | | 1932 | .110 | 1939 F/Y | .177 |
| | | 1933 | .124 | 1940 F/Y | .181 |

During the base period, the second Sales Company had total net income of $167,385 and paid petitioner dividends totaling $142,000 and interest totaling $191,850.

On June 22, 1950, within the time allowed by law, petitioner filed claims for refund of excess profits taxes under the provisions of section 735 of the Internal Revenue Code of 1939. These claims were all filed on Treasury Department Form 843 and sought refund of excess profits taxes by years and in the amounts as follows:

| Fiscal year | Amount of refund claimed |
|---|---|
| 1943 | $6,061.02 |
| 1944 | 5,992.03 |
| 1945 | 5,655.56 |
| 1946 | 3,772.58 |

These claims for refund under section 735 were all considered by respondent on their merits and then denied by him by registered letters dated December 14, 1953.

In computing its excess profits net income for the fiscal years 1943 to 1946, inclusive, petitioner is entitled to a deduction for its exempt excess output as provided under section 735 of the Code. The amounts of exempt excess output claimed by petitioner and the amounts allowed by respondent are, respectively, as follows:

| Fiscal year | Amounts claimed | Amounts allowed |
|---|---|---|
| 1943 | $110,602.63 | $103,119.90 |
| 1944 | 134,700.93 | 127,404.16 |
| 1945 | 149,123.62 | 142,508.92 |
| 1946 | 69,600.30 | 63,743.87 |

The variances in the exempt excess output credits claimed by petitioner and the credits allowed by respondent result from a difference between the parties regarding the number of months petitioner was "in operation" within the purview of section 735.

In its computation of exempt excess output the petitioner used a base period of 51 months—January 1, 1936, through March 31, 1940. Respondent reduced the number of months petitioner was in operation during the base period by eliminating one month in 1937 and another month in 1939 when one or more of petitioner's mines were not in commercial production throughout the month because of the coal strikes in those years.

During the months in which petitioner's miners were on strike in the base period, petitioner kept its work signs up at the mines, the pumps and fans going, continued to supply data and information to the Bureau of Mines and various State bureaus, continued to rent houses to its miners and to supply them with electricity, and furnished credit to its miners without security. Petitioner also continued to operate its stores for its employees, kept its mine offices and its selling offices in operation, took orders for coal and shipped any coal that it had on hand, continued to belong to the various coal operators' associations, and received railroad cars at its mines.

If the weather was bad during a strike and the miners needed coal for their own use, they would go into the mine and mine coal which was then sold to them by petitioner. During a strike the miners could not draw unemployment compensation, and they continued to earn and accrue their vacation pay.

Petitioner's contracts with the miners' union provided that the men would work during strikes to keep the pumps and fans going, would clean up roof falls, and would install timbers if necessary to keep the mine in a safe condition. The contract in effect from October 1, 1935, through March 31, 1941, in the Hazard coal fields reads in part as follows:

### Engineer and Pumpers' Duties

When required by the management, engineers, pumpers, firemen, power plant and substation attendants shall under no conditions suspend work but shall at all times protect all the company's property under their care, and operate fans and pumps and lower and hoist men or supplies as may be required to protect the company's coal plant.

Similar provisions were in the other union contracts under which petitioner operated during this period.

The railroads maintain lists of all operating mines. The railroads keep a mine on its list of operating mines even though the miners are on strike. During a strike period the railroads continue to maintain their tracks leading to the mines and supply the mines with empty cars so that they will be available when production is resumed. When a mine ceases operations it is placed on the inactive list of the railroads, maintenance of the tracks to the mines is stopped, and the railroads will not furnish the mine with cars. Petitioner has never been in a position where the railroads would not supply it with cars.

When petitioner anticipates a strike, it tries to accumulate as many loaded railroad cars of unsold coal as is possible at the mine so that it can take care of its customers to some extent during the strike.

It is necessary that a mine be maintained during a strike in order that it may resume production when the strike is over. If a mine is not maintained during a strike, it takes from 30 to 60 days to attain production again.

When a mine is closed down the men are discharged, their employment agreements are terminated, and they can draw unemployment compensation until they find other work. The mine maintenance is stopped, the store and office are closed, power is disconnected, the fans and pumps are removed, and the tracks are pulled back. If a mine is closed down, it often may not be worthwhile to reopen it.

The general practice in the coal industry is to maintain a mine in a state of readiness to resume production of coal during periods when its miners are on strike.

The stipulated facts, oral and written, are found as stipulated, and are incorporated herein by reference. Exhibits 122 and 123, detailed schedules of petitioner's operations for the periods 1922 through March 31, 1940, and the fiscal years 1941 through 1953, respectively, Exhibit MMMM, a schedule showing output of bituminous coal in the United States and the Federal Reserve Index of Industrial Production, 1922–1939, and Exhibit ZZZZ, a schedule showing value of output of bituminous coal and total compiled receipts of all corporations in the United States, 1922–1939, with indexes, are incorporated herein by reference.

OPINION.

Respondent has abandoned the inventory issue raised in his amended answer in Docket No. 26297. Respondent likewise does not now contest the issue relating to the question of whether petitioner did or did not file a supplemental claim for refund of excess profits taxes paid for its fiscal year ended in 1943.

We discuss *infra* the question of whether or not petitioner has qualified for 722 relief. Since we find it has not qualified, there is no occasion for us to discuss the problem of reconstruction. Likewise, we need not consider respondent's alternative contention that petitiner's claims under section 722 were presented to this Court on a theory and alleged facts which had not previously been presented to or considered administratively by respondent.

In addition to the question of qualification for 722 relief, there is an issue, likewise to be considered *infra*, relating to whether or not

respondent has understated the exempt excess output deduction to which petitioner is entitled.[2]

### 1. Issue Relating to Qualification for Section 722 Relief.

While petitioner makes some reference to paragraphs of section 722 other than 722(b)(2),[3] it is evident that its substantial reliance is upon 722(b)(2) and that there is no evidence which would support relief under 722(b)(1) or (b)(3), (4), or (5). On reply brief, petitioner states that it no longer contends that it qualified for relief under section 722(b)(3).

In arguing that its business was depressed in the base period because of temporary and unusual economic circumstances, petitioner succinctly states its position on brief as follows:

The record shows without contradiction that from 1924 through 1934 labor costs and the average value of coal at the mines remained relatively proportionate * * *. Starting in 1935 and lasting throughout the base period the average labor costs rose sharply, while the average value per ton of coal at the mine did not increase to anywhere near the same degree. This disparity between wages and value of coal was a very unusual economic condition during the statutory base period and it affected the petitioner in the same way that it did the industry * * *. Expressed percentagewise, the labor cost of the petitioner in relation to its average realization was as follows * * * :

| Period | Labor cost per cent |
|---|---|
| Calendar years 1922 through 1935 | 58.3137 |
| Base period | 65.5370 |
| Fiscal years 1941 through 1953 | 62.1424 |

Labor costs as a per cent of realization reached a peak in 1939 while selling and administrative costs remained relatively constant during the period from 1922 through 1950 * * *

The first of the two factors adverted to by petitioner is a comparison of the average value of coal at the mines in relation to labor costs for the years 1924 through 1934 with like factors during the base period. It is clear upon the whole record, however, that such average

---

[2] In an earlier appeal in the instant case (sub nom. *Commissioner* v. *Blue Diamond Coal Co.*, 230 F. 2d 312 (C.A. 6, 1956)), the Court of Appeals held that this Court has jurisdiction over standard issues.

[3] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * *

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

value, reflected in the price of coal during both periods, was basically and substantially controlled by competition. Other factors, such as freight rates, were significant, but do not alter the basic picture presented in the instant case. Such competition affecting organizations mining bituminous coal was neither temporary nor unusual. It had all of the earmarks of relative permanency and was a normal factor in petitioner's own business and that of its industry. We have repeatedly recognized that, except in unusual circumstances (such as ruinous price wars), none of which are here present, the effects of ordinary economic hazards, such as competition, do not furnish a basis for qualification under section 722(b)(2). See *Avey Drilling Machine Co.*, 16 T.C. 1281, 1293 (1951). In *Constitution Publishing Co.*, 23 T.C. 19 (1954), we said, in part (p. 29):

> The petitioner contends that the competition it received from the Georgian was temporary because no third newspaper could expect long to survive in Atlanta and unusual because the Hearst interests were callous to the substantial losses experienced by the Georgian. However, we have said, "Competition is present in almost any business. Instead of it being something unusual, it is quite common. It is of the very essence of our capitalistic system." *Lamar Creamery Co.*, 8 T.C. 928, 939. * * *

See also *Winter Paper Stock Co.*, 14 T.C. 1312, 1319 (1950); *Brown Paper Mill Co.*, 23 T.C. 47, 68 (1954); *Democrat Publishing Co.*, 26 T.C. 377, 382 (1956); *Seggerman Nixon Corporation*, 26 T.C. 442, 453 (1956); *Tri-State Beverage Distributors, Inc.*, 27 T.C. 1026, 1032 (1957).

We hold on the basis of the foregoing that neither bituminous coal sales prices nor value of such coal at the mine may be considered as a basis for 722(b)(2) relief since the significant control factor was competition which was neither temporary nor unusual for petitioner or its industry.

The second factor urged by petitioner is the increase of labor cost during the base period over such costs during the 1924 through 1934 period (together with the fact that the average value per ton of coal at the mine did not increase to the same degree). The record discloses that such increase in labor costs was largely the result of unionization of petitioner's mines.

The cost of labor is itself largely the result of a form of competition, of which unionization is frequently a significant factor. We think it just as clearly a normal business hazard as competition affecting prices, and that like principles are to be applied in relation to section 722(b)(2). While petitioner's mines were not unionized from about 1922 until sometime in 1933, it is clear that, from the latter year, unionization was relatively permanent as far as petitioner was concerned, and, broadly speaking, showed a growth trend in petitioner's industry and in the American economy in general. Clearly,

upon the record, unionization and the consequence in increased labor costs to petitioner were not temporary, but were relatively permanent.

In the light of the foregoing, the increased cost of labor shortly prior to and during the base period is not a basis for relief under section 722(b)(2).

The cause of the failure of coal prices to rise to the same extent as labor costs, and the cause of the increase in labor costs, were unrelated, the first, as we have said, being due primarily to competition between members of the industry, and the second to unionization. Neither is a factor warranting relief under section 722(b)(2). It is likewise our view that consideration of the two factors together does not qualify petitioner for relief. There is nothing to suggest that section 722(b)(2) was intended to underwrite relief which would, in effect, give petitioner the benefit of a constant proportionate relationship between selling price and labor cost. We find no basis for the view that, if prices are kept down through competition, labor costs must be proportionately reduced by constructive relief, or, conversely, that if labor costs increase, prices must be proportionately reconstructed.

We have no doubt, upon the record before us, that from the perspective of the base period, and but for the war and postwar inflation, petitioner, and its industry, was facing a long, nontemporary period in which labor costs would be far higher than in the 1924–1934 period, accompanied by conditions of heavy, and perhaps increasing, competition. We do not think the 1924–1934 period was typical of base period conditions, or that it indicates that base period competitive conditions and labor costs were temporary. We do not suggest, of course, that the relationship of prices and labor costs in the base period would have continued indefinitely in the same proportion to each other. We do think, however, that such relationship might well have become less favorable to petitioner (but for the war and its aftermath), and that, in any event, there is no reliable evidence that it would have become more favorable after a temporary normal period of readjustment. Our analysis, from the perspective of the base period, is that the over-all trend was in the direction of diminishing profits, and that there was no indication of a return to the relatively proportionate relationship of labor costs and average value of coal at the mines during the 1924–1934 period.

We conclude, therefore, that petitioner has demonstrated no basis for qualification for relief under section 722(b)(2). We note that petitioner relies upon *Dyer Engineers, Inc.*, 10 T.C. 1265, 1273 (1948), in support of its views. We think it clear that *Dyer* distinguishes itself on the facts from the instant case, and makes no holding which is here applicable or controlling. We add that we likewise find no other authority supporting petitioner's contention.

As was probably natural during the period of administrative consideration of the instant case and the somewhat tortuous evolution of principles applicable to section 722, there have been some changes of approach to the question of whether petitioner is entitled to relief. In our discussion, *supra*, we have fully considered the contentions upon which petitioner appears to rely as basic and final. To the extent that other contentions have from time to time been suggested, we find them unacceptable and either to have been abandoned or foreclosed by our opinion in *Norfolk & Chesapeake Coal Co.*, 18 T.C. 904 (1952).

### 2. Section 735 Issue.

Section 735 allows natural resource industries an exemption from excess profits tax for production in excess of their normal production during the base period. There is no significant dispute as to the facts, which are set forth fully in our findings.

The sole issue is whether the mines of petitioner were in operation, within the meaning of section 735, during the full base period of 51 months or whether there should be excluded from base period operations 1 month in 1937 and another in 1939, when one or more of petitioner's mines were closed because of strikes by coal miners.

During the months in which petitioner's miners were on strike in the base period, petitioner kept its work signs up at the mines, the pumps and fans going, continued to supply data and information to the Bureau of Mines and various State bureaus, continued to rent houses to its miners and to supply them with electricity, and furnished credit to its miners without security. Petitioner also continued to operate its stores for its employees, kept its mine offices and its selling offices in operation, took orders for coal and shipped any coal that it had on hand, continued to belong to the various coal operators' associations, and received railroad cars at its mines.

If the weather was bad during a strike and the miners needed coal for their own use, they would go into the mine and mine coal which was then sold to them by petitioner.

We have set forth the relevant provisions of section 735 in a marginal note.[4] It would be futile to approach the issue without a care-

---

[4] SEC. 735. NONTAXABLE INCOME FROM CERTAIN MINING AND TIMBER OPERATIONS, AND FROM NATURAL GAS PROPERTIES.

(a) DEFINITIONS.—For the purposes of this section, section 711(a)(1)(I), and section 711(a)(2)(K)—

(1) PRODUCER; LESSOR; NATURAL GAS COMPANY.—The term "producer" means a corporation which extracts minerals from a mineral property, * * *

(2) MINERAL UNIT, NATURAL GAS UNIT, AND TIMBER UNIT.—The term "mineral unit" means a unit of metal, coal, or nonmetallic substance in the minerals *recovered* from the operation of a mineral property. * * *

(3) EXCESS OUTPUT.—The term "excess output" means the excess of the mineral units, natural gas units, or timber units for the taxable year over the normal output.

ful examination of section 735 as a whole, but equally futile to extend this discussion to include a detailed paragraph by paragraph analysis. There are, however, certain key expressions to which specific reference may be appropriate. (All emphasis in such reference is supplied.)

In section 735 (a) (2), the following is to be found:

The term "mineral unit" means a unit of \* \* \* coal \* \* \* *recovered* from the operation of a mineral property. \* \* \*

In section 735 (a) (4), the following expressions are found:

The term "normal output" means the average annual *mineral units* \* \* \* *recovered* \* \* \*. \* \* \* the number of months for which the *mineral property* \* \* \* was *in operation* during the base period \* \* \*

In section 735 (b) (1), reference is made to "*mineral property* which was *in operation* during the base period." Reference is made in section 735 (b) (2) to "*coal mining* \* \* \* *property* which was *in operation* during the base period," and section 735 (b) (4) refers to "*coal mining* \* \* \* *property* \* \* \* *which was not in operation during the base period.*"

---

Footnote 4—Continued

(4) NORMAL OUTPUT.—The term "normal output" means the average annual *mineral units,* \* \* \* *recovered* in the taxable years beginning after December 31, 1935, and not beginning after December 31, 1939 (hereinafter called "base period"), of the person owning the mineral property \* \* \* (whether or not the taxpayer). \* \* \* The average annual mineral units, \* \* \* shall be computed by dividing the aggregate of such mineral units, \* \* \* for the base period by the number of months for which the *mineral property,* \* \* \* was *in operation* during the base period and by multiplying the amount so ascertained by twelve. In any case in which the taxpayer establishes, under regulations prescribed by the Commissioner with the approval of the Secretary, that the *operation of any mineral property,* \* \* \* is normally prevented for a specified period each year by physical events outside the control of the taxpayer, the number of months during which such *mineral property,* \* \* \* is *regularly in operation* during a taxable year shall be used in computing the average annual mineral units, \* \* \* instead of twelve. Any *mineral property,* \* \* \* which was *in operation* for less than six months during the base period, shall, for the purposes of this section, be deemed *not to have been in operation during the base period.*

\*     \*     \*     \*     \*     \*     \*

(9) NORMAL UNIT PROFIT.—The term "normal unit profit" means the average profit for the base period per mineral unit for such period, determined by dividing the net income with respect to minerals recovered from the mineral property (computed with the allowance for depletion computed in accordance with the basis for depletion applicable to the current taxable year) during the base period by the number of mineral units recovered from the mineral property during the base period.

(10) ESTIMATED RECOVERABLE UNITS.—The term "estimated recoverable units" means the estimated number of units of metal, coal, or nonmetallic substances in the estimated recoverable minerals from the mineral property at the end of the taxable year plus the excess output for such year. All estimates shall be subject to the approval of the Commissioner, the determinations of whom, for the purposes of this section, shall be final and conclusive.

\*     \*     \*     \*     \*     \*     \*

(12) UNIT NET INCOME.—The term "unit net income" means the amount ascertained by dividing the net income (computed with the allowance for depletion) from the coal or iron ore or the timber recovered from the coal mining property, iron mining property, or timber block, as the case may be, during the taxable year by the number of units of coal or iron ore, or timber, recovered from such property in such year. \* \* \*

Section 735 was obviously designed to encourage mineral resource industries to enlarge their production during the crucial years of the war. We stated its purpose in *Gifford-Hill & Co.*, 11 T.C. 802 (1948), affd. 180 F. 2d 655 (C.A. 5, 1950), in which we said (p. 814):

An examination of section 735 and its legislative history convinces us that its purpose was to stimulate the production of natural resources required for the manufacture of war materials and the construction of training camps, airfields, ordnance plants, etc., necessary for the conduct of the war. It gives producers of minerals an incentive to produce an amount in excess of normal output of a mineral property by providing that a substantial portion of the income realized as a result of any excess output may be excluded from excess profits net income. To assist in the determination of the portion of the amount produced in a war year which constituted "excess output," this term is defined in subsection (a)(3) to mean the excess of the mineral units for the taxable year over the normal output. Subsection (a)(4) defines "normal output" to include the average annual mineral units recovered from the mineral property in the base period years of the person owning the property (whether or not the taxpayer).

Considering the statute as a whole, and in the light of its objective, it is our view that coal or mineral property is to be deemed to have been "in operation" only when it was being actively operated in the commercial production of coal or other minerals covered by the statute. During the strikes in the 2 months in question, the mine or mines involved were not operating, in any substantial or realistic sense, in the commercial production of coal. We do not think the statute intended that wording such as coal or mineral "property * * * in operation" was to be deemed satisfied by the limited activity of mining by the miners for their own use, needs, or comfort. We likewise do not think it significant that work signs were kept up, reports furnished, maintenance activities carried on, houses rented, and miners'

---

Footnote 4 continued from p. 801.

(b) NONTAXABLE INCOME FROM EXEMPT EXCESS OUTPUT.—

(1) GENERAL RULE.—For any taxable year for which the excess output of *mineral property* which was *in operation* during the base period exceeds 5 per centum of the estimated recoverable units from such property, the nontaxable income from exempt excess output for such year shall be an amount equal to the exempt excess output for such year multiplied by the normal unit profit, but such amount shall not exceed the net income (computed with the allowance for depletion) attributable to the excess output for such year.

(2) COAL AND IRON MINES.—For any taxable year, the nontaxable income from exempt excess output of a *coal mining* or iron mining *property* which was *in operation* during the base period shall be an amount equal to the excess output of such property for such year multiplied by one-half of the unit net income from such property for such year, or an amount determined under paragraph (1), whichever the taxpayer elects in accordance with regulations prescribed by the Commissioner with the approval of the Secretary.

      *        *        *        *        *        *        *

(4) COAL AND IRON MINES AND TIMBER PROPERTIES NOT IN OPERATION DURING BASE PERIOD.—For any taxable year, the nontaxable income from exempt excess output of a *coal mining* or iron mining *property* or a timber block, *which was not in operation during the base period,* shall be an amount equal to one-sixth of the net income for such taxable year (computed with the allowance for depletion) from the coal mining or iron mining property or from the timber block, as the case may be. [All emphasis supplied.]

needs supplied. The same view applies to sales activity, receiving of railroad cars, and shipments. These activities would normally have continued whether the mining property was in operation or not unless the mine was abandoned. Fundamentally, the "operation" of the "coal mining * * * property" consisted of the production of coal, in the instant case, the encouragement of which was the basic objective of the statute. Other activities would be expected to accompany such production as circumstances required and dictated.

We find no suggestion in the statute that an exception was intended where the closing of the mines was due to strikes, which clearly were not circumstances under which the operation of the property "is normally prevented for a specified period each year by physical events outside the control of the taxpayer" within the meaning of section 735(a)(4). Likewise, as indicated above, we find no suggestion in section 735 that an exception is to be made merely because some collateral activities, other than the commercial production of coal, were kept up during the periods in question.

We, therefore, agree with the construction of section 735 urged by respondent.

Petitioner, in arguing to the contrary, cites *Penton* v. *United States*, 259 F. 2d 536 (C.A. 6, 1958), in which the Court of Appeals, with one dissent, reversed the decision of the District Court. *Penton*, however, involved the question of an operating loss carryback, the statutory provisions relating to which arise in a different context and differ widely in both language and purpose from the provisions of section 735. The holding of the Court of Appeals in *Penton* does not, in our opinion, aid in any material respect in the construction of section 735.

Reviewed as to section 722 issue by the Special Division.

*Decisions will be entered under Rule 50.*