## COMMISSIONER OF INTERNAL REVENUE v. GIFFORD–HILL & CO., Inc.

### No. 12856.

United States Court of Appeals
Fifth Circuit.
March 16, 1950.

---

Hilbert P. Zarky, Ellis N. Slack, and Lee A. Jackson, Sp. Assts. to Atty. Gen., Theron Lamar Caudle, Asst. Atty. Gen., Charles Oliphant, Chief Counsel, Bureau of Internal Revenue, Washington, D. C., John M. Morawski, Special Atty., Washington, D. C., for petitioner.

Robert Ash, Washington, D. C., Carl B. Callaway, Dallas, Tex., for respondent.

Before HUTCHESON, Chief Judge, and WALLER and BORAH, Circuit Judges.

WALLER, Circuit Judge.

Respondent, a corporation, has, since its organization in 1926, been engaged in the business of mining and selling sand and gravel. The question in the case here involves assessed deficiencies in excess profits taxes for the years 1942 and 1943, the solution to which must be found in the interpretation to be given subsection 735(a) (6) of the Internal Revenue Code, 26 U.S. C.A. § 735(a) (6), as applied to section 711(a) (1) (I) and section 711(a) (2) (K), and whether or not subsection 35.735-2 (f) of the Treasury Regulations, in undertaking to define the term "mineral property" was in conformity to section 735(a) (6) and, therefore, applicable, or whether out of conformity and, therefore, void.

The Tax Court, in an opinion reported at 11 T.C. 802 [reviewed by the whole Court], held that the regulation defining a mineral deposit did not follow, and correctly interpret, the language of the statute and was, therefore, invalid.

Section 735, subsections (a) (6) and (a) (7), are as follows:

"(6) Mineral Property. The term 'mineral property' means a mineral deposit, the development and plant necessary for the extraction of the deposit, and so much of the surface of the land as is necessary for purposes of * * * extraction.

"(7) Minerals. The term 'minerals' means * * * such nonmetallic substances as * * * gravel, * * * sand, * * *."

The regulation in question is as follows: "(f) Mineral property.—The term 'mineral property' means a mineral deposit, the development and plant necessary for the extraction of the deposit, and so much of the surface of the land as is necessary for the purposes of such extraction. The term 'mineral deposit' refers to the minerals in place. The taxpayer's interest in each separate mineral property is a separate 'property.' If the mineral deposit in which a taxpayer owns an economic interest extends beyond the boundaries of a single tract or parcel of land a separate mineral property exists with respect to each tract or parcel of land into which the mineral deposit extends. Where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single 'property,' pro-

vided such treatment is consistently followed."

In final analysis the issue for our decision is whether or not the Tax Court erred in holding void, as applied to the taxpayer, the aforementioned regulation which undertook to define "a mineral property" as "each tract or parcel of land into which the mineral deposit extends."

During the tax years the taxpayer conducted sand and gravel mining operations in three areas in Texas and Louisiana, herein designated as the Texarkana, Turkey Creek, and Hearne operations, as well as at ten or eleven other places not involved in this controversy. The lands, or the minerals, embraced in the operations at the three named places were acquired by the taxpayer in some instances by purchase of the fee, and in other instances by acquisition of leases and the payment of a stipulated price per yard for gravel and sand taken therefrom.

Sand and gravel were created by great glacial movements and deposited in low topographical areas but in the coastal plains of Texas and Louisiana sand and gravel of the type utilized in the respondent's operation were deposited by the action of the currents in the angle formed by the confluence of two streams. Such latter deposits are generally not uniformly distributed and in the deposits furthest away from the confluence of the stream there is more foreign matter than in the deposits nearer the current of the streams.

In the effective processing of sand and gravel considerable machinery and much water is required. Accessibility to water and also to railroad transportation also are quite essential. The over-burden must be removed by draglines from above the gravel deposit, and the gravel and sand, whether taken out by dragline or by dredging, must be washed, screened, and graded in order to obtain the maximum advantages in production. These deposits are without regard to land lines and boundaries. It is often impossible to procure the entire deposit from one single tract of land. The operation of taking of sand and gravel, whether by dredging or by dragline, is not static since the dragline or the dredge moves on under its own power as it exhausts the supply at any particular point. Thus the operation advances from one tract of land to another as the work progresses and the material is exhausted.

Before any reasonably prudent operator would incur the expense of acquiring the expensive and extensive equipment needed he would find it necessary to explore, block out, obtain, or be assured of, a sufficient supply of sand and gravel to justify the outlay and to hold out the prospect of appropriate profit from the enterprise.

The operations of the respondent in the Texarkana area are not all upon contiguous tracts. On a number of the separate tracts acquired by respondent the deposit was insufficient for prudent or profitable operations. Moreover, the size, type, depth, and grade of deposit is not uniform, and at times it was necessary to operate at a point on some tract that produced most readily the size and grade fitted for the particular need at that moment. The lack of uniformity, therefore, required the mining operation to be carried on wherever the currents had made the deposit of the type of material needed. In the Texarkana area the respondent owned, or had leased, some sixty separate tracts and from only five of these were the operations carried on during the tax years in question. A number of these tracts had been completely mined out before 1942.

In the Turkey Creek operation there were six tracts of land and they were all contiguous and all a part of the same deposit. The Hearne operation lies in the angle formed by the Brazos and Little Brazos Rivers in Texas. It also embraced six tracts of land which contain a part of the same deposit. The production of gravel at Texarkana was by draglines, while at Turkey Creek and Hearne the production was by dredging. A dredge is not movable except as it digs itself from place to place.

The question here is, specifically, what the statutory term "mineral property" means as applied to the operations of respondent. According to the Commissioner each separate tract of land should be deemed a mineral property. The statute, subsection (a) (6), section 735, Internal

Revenue Code, defines mineral property as "a mineral deposit, the development and plant necessary for the extraction of the deposit, and so much of the surface of the land as is necessary for purposes of * * * extraction."

The answer to this question has a vital relation to excess profits tax because Congress, in order to increase the war-time production of essential minerals—particularly sand and gravel which were needed in great quantities for concrete construction in paving roads and runways and building foundations, etc.—provided an exemption from taxes of the percentage that the excess output of any such "mineral property" in the tax year over the output of a base period of such mineral property bore to the estimated recoverable units from such property.

We have been cited to no adjudicated case in the Federal Courts that is decisive of the question here involved. In the tax years the mineral units recovered from the three mineral deposits worked by the taxpayer exceeded the average annual mineral units recovered during the base period, and it is entitled to exclude the net income realized from this exempt excess output in those years in determining the excess profits net income for those years.

We agree with the Tax Court that Section 735 was enacted for the purpose of stimulating the production of sand and gravel, along with other minerals, in order to aid in the prosecution of war, by providing that a substantial portion of the income realized as a result of any excess output might be excluded from excess profits net income.

We further agree with the Tax Court that in the mining of sand and gravel under the circumstances involved in this case a mineral deposit in a single tract of land did not constitute mineral property within the terms of the statute. Encompassed in the statutory term "mineral property" there must be included "a mineral deposit, the development and plant necessary for the extraction of the deposit, and so much of the surface of the land as is necessary for purposes of extraction." Due to the fact that extensive and expensive equipment are essential to the taking out and development of the mineral deposit, and to the fact that the deposits were shown in the present case not to be coterminous with the boundaries of any single tract of land, and to the fact that there would, in prudent operation, never be a development of a sand and gravel deposit so small as to be unprofitable, we conclude that the Tax Court correctly held that the regulation was contrary to the statute and that the term "mineral property" should not be applied in the taxpayer's mining operation to each single tract of land but to the development or operation as a whole.

The decision of the Tax Court is affirmed.