ESTATE of James E. BRYAN, Deceased, First Citizens Bank and Trust Company, Executor; and Estate of Mary Z. Bryan, Deceased, Byron E. Bryan, Executor, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 8284.

United States Court of Appeals Fourth Circuit.

Argued April 5, 1961.

Decided May 31, 1961.

Stanley Worth, Washington, D. C. (Edward S. Smith, and Blair, Korner, Doyle & Worth, Washington, D. C., on brief), for petitioners.

James P. Turner, Attorney, Department of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Melva M. Graney, Attorneys, Department of Justice, Washington, D. C., on brief), for respondent.

Before SOPER and BOREMAN, Circuit Judges, and HARRY E. WATKINS, District Judge.

SOPER, Circuit Judge.

These petitions for review seek a reversal of the decisions of the Tax Court which approved determinations of deficiencies of income taxes by the Commissioner of Internal Revenue against the estates of two deceased taxpayers. The question involved is the computation of a depletion deduction from the gross income of twelve sand, gravel, and rock quarries which were treated as a single unit by the taxpayers but as separate units by the Commissioner in making the computation. The Commissioner's computation resulted in greater tax liabilities because the tax statute, § 114 (b) (4) (A) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 114(b) (4) (A), which provides for an allowance for depletion in the case of sand, gravel, and granite deposits of 5 per cent of the gross income from the property involved, limits the depletion allowance to 50 per cent of the net income of the taxpayer therefrom.

James E. Bryan and Mary Z. Bryan, his wife, were copartners in an enterprise known as the Bryan Rock and Sand Company which was engaged in the operation of twelve sand, gravel, and rock quarries. James died on February 5, 1953. After his death a limited partnership was formed to carry on the business, in which Mary was a general partner and the estate of James was a limited partner. Mary died on July 9, 1957. The Commissioner determined a deficiency of $12,097.87 against the estate of James for the period February 5, 1953 to January 31, 1954, and a deficiency of $2,789.28 against the estate of Mary Z. Bryan for the taxable year ended December 31, 1954. The deficiencies in both cases arise from the manner in which the Commissioner computed the depletion allowance on the gross income of the limited partnership.

The quarry properties were not contiguous. They were located in eight different counties of North Carolina and one county of Virginia and were separated by various distances up to 225 miles. So far as was practicable they were treated by the partnership as a unit. The overall business operations were conducted in a central office in Raleigh, North Carolina, where the books and records of the business were kept. Equipment and personnel were moved from one quarry to another when necessary but no records of the movements were kept. The principal repair shops where the equipment was repaired were located at two of the quarries but in some instances repairs of heavy equipment were made at the quarry where the equipment was located. The cost of all repairs was charged to one or the other of the two quarries where the repair shops were located and not to the quarries where the equipment was operated. Carload lots of material used in the mining operations were purchased by the firm and charged to the quarry at which the material was delivered, but the material was sent from one quarry to another if needed. Orders were generally filled from the quarry designated by the sales orders but occasionally they were filled from another quarry if it was

economically profitable to do so. No allocation of the general and administrative expenses was made amongst the twelve quarries but the sales and other costs and the machinery depreciation records were kept on an individual basis.

For the fiscal year ending January 31, 1954, the limited partnership computed the percentage depletion, provided in §§ 23(m) and 114(b) (4) (A) (i) of the Code of 1939, 26 U.S.C.A. §§ 23(m), 114 (b) (4) (A) (i), at 5 per cent of the gross income derived from the combined sales of mined material at all of the twelve quarries and claimed an allowance of $190,624.38. No attempt was made to show any breakdown between the quarries. The Commissioner computed the gross income of each of the twelve quarries separately, allocated the general and administrative expenses among the twelve quarries on the basis of their respective sales, and reduced the depletion allowance to $163,020.32. The Tax Court found that although the quarries were operated as a single unit in order to meet competition more effectively it was possible to operate each quarry separately at a profit, and concluded, since the twelve quarries were widely separated and were separate properties, that the depletion allowance must be separately computed as to each quarry and therefore approved the Commissioner's determinations.

Section 114(b) (4) (A) (i) of the statute fixes the allowance for depletion in the case of sand, gravel, slate and stone at 5 per cent "of the gross income from the property during the taxable year." The definition of the words "the property" on which the Tax Court relied in its decision is set out in Treasury Regulations 118, promulgated under the Internal Revenue Code of 1939, as follows:

"Sec. 39.23(m)–1. *Depletion of mines, oil and gas wells, other natural deposits, and timber; depreciation of improvements.*—

\* \* \* \* \* \*

"(d) When used in §§ 39.23(m)–1 to 39.23(m)–19, inclusive—

\* \* \* \* \* \*

"(2) A 'mineral property' is the mineral deposit, the development and plant necessary for its extraction, and so much of the surface of the land only as is necessary for purposes of mineral extraction. The value of a mineral property is the combined value of its component parts.

\* \* \* \* \*

"(i) 'The property,' as used in section 114(b) (2), (3), and (4) and §§ 39.23(m)–1 to 39.23(m)–19, inclusive, means the interest owned by the taxpayer in any mineral property. The taxpayer's interest in each separate mineral property is a separate 'property'; but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single 'property,' provided such treatment is consistently followed."

Obviously the twelve quarries of the taxpayers are *separate* properties and not a *single* property within the terms of the regulation and the decision of the Tax Court is accordingly correct, if the regulation correctly interprets the provisions of the statute. The taxpayers, however, contend that the regulation is not controlling because it fails to take into account an amendment to the statute passed in 1943 whereby a new paragraph denominated (B) was added to § 114(b) (4), wherein the gross income from mining property was defined. Paragraph (B) provides in part as follows:

"(B) Definition of gross income from property.—As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied to mine owners or operators in order to obtain the commercially marketable mineral product or prod-

ucts, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills. * * "

Basing their argument on this amendment to the statute the taxpayers say:

"The whole intendment and purpose of subparagraph (B) of § 114 (b) (4) is to separate from all other activities, the gross income (and net income) from mining, and to confine the percentage depletion deduction to the mining activities. No further breakdown is contemplated." * * * "Nor is there anything to indicate that because a processing plant and the mine may be 50 miles apart, or even more, they must, *ipso facto*, be treated as separate properties for the purpose of applying the 50 per cent limitation." * * *

"By the plainest of language in the statutory definition, the words 'the property,' as they appear in that definition, mean 'mining'; and it is not necessary or proper, in the light of the legislative history, to look elsewhere for the meaning of these words. United States v. Cannelton Sewer Pipe Co., 364 U.S. 76 [80 S.Ct. 1581, 4 L.Ed.2d 1581], leaves no room for doubt on that score."

We do not follow the argument. It is quite obvious that the words "the property" are not synonymous with the term "mining" in the ordinary meaning of the language; and there is nothing in Cannelton which justifies the interpretation for which the taxpayers now contend. The Supreme Court decided in that case that the depletion allowance of a miner-manufacturer of burnt clay products from fire clay and shale should be based upon the value of the raw product after the application of ordinary treatment processes and not upon the value of sewer pipe or other products manufactured therefrom. The Court showed that after Congress extended the depletion allowance, first granted to oil and gas products, so as to include the mining industry, the Treasury regulations defined the gross income from the property as the sales price of crude minerals or the products derived therefrom before the application of any processes save those normally used to make the mineral marketable. These regulations met the approval of Congress and were embodied as paragraph (B), set out above, in the Act of 1943, 58 Stat. 21, 44. The decision had no bearing upon the definition of property in Regulation § 39.23(m) (1), set out above, and there is nothing in it to support the contention that the words "the property" and "mining" mean one and the same thing.

The taxpayers' argument really involves the thesis that if it is economically desirable for a mining operation involving a number of separate properties to be carried on as an integral enterprise the owners should be given a depletion allowance computed on the aggregate income [1] and the statute should be interpreted with sufficient liberality to accom-

---

1. The taxpayers take issue with the statement in the opinion of the Tax Court that it would not have been unprofitable for the quarries to have been operated separately. Reference is made to evidence tending to show the great economies from the operation of the several tracts as a whole and the impracticability of keeping separate records of each individual plant, which would have involved the expenditure of several thousands of dollars. It is said that since the quarries had never operated separately it is highly speculative to predict what might have been the result had they done so. The evidence as a whole, however, does not tend to show that the separate operation of the quarries would have produced a loss but merely that it would not have been as profitable as the consolidated operation actually conducted by the taxpayers. In any event, the success of the several operations has little bearing on the proper interpretation of the statute.

plish this end. This indeed was the effect of the decision in Commissioner v. Gifford-Hill & Co., 5 Cir., 180 F.2d 655, on which the taxpayers rely. That case involved the application of the excess profit tax statutes (26 U.S.C. §§ 735 and 736 in connection with §§ 711(a) (1) (I) and 711(a) (2) (K), Internal Revenue Code, Excess Profit Taxes), to the income of a corporation, engaged during the war years 1942 and 1943 in the business of mining and selling sand and gravel from divers tracts of land, whereby a substantial part of the income of the operations in excess of the income from the business during a prewar base period was exempted from the tax. The statutes declared that the term "mineral property" means a mineral deposit and the relevant Treasury regulation provided that the taxpayers' interest in each separate mineral property is a separate property; and if the deposit extends beyond the boundaries of a single tract a separate mineral property exists as to each tract; but if two or more mineral properties are included in a single tract the taxpayers' interest may be considered a single property.

The taxpayers operated three areas in Texas and Louisiana. In each of these areas the tracts were of the same deposit, which was formed as a result of the confluence of two rivers and in two of the three areas the tracts were contiguous. See 11 T.C. 802, 813–816.

The Tax Court and the Court of Appeals held that the regulation was contrary to the statute and that the term "mineral property" should not be applied in the taxpayers' mineral operations to each single tract but to the development in each area of the mining operation as a whole. No attempt was made to distinguish between those properties which were separate and those which were contiguous. The Court of Appeals could find no case in the federal courts bearing on the question and frankly based its decision on the manifest purpose of Congress to increase the wartime production of essential minerals, particularly sand and gravel, for construction projects needed in the prosecution of the war. The court found that this purpose would be better served if the mining operations received the greater tax exemption that would flow from treating the mining operations of the *several tracts* as a *single enterprise*. This reasoning, inspired by the requirement of the war emergency, is not applicable to the question now before the court and does not, in our opinion, justify the conclusion that the Treasury regulations under consideration are invalid.

It is of significance that § 39.23(m)–1 of the regulation relating to the depletion of mines, above set out, remained substantially unchanged and that Congress in the enactment of successive taxing statutes throughout the years made no change in the rule until the enactment of § 614 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 614. Therein the general rule to be applied in the definition of property provides that for the purpose of computing depletion allowance the term "property" means each separate interest owned by the taxpayer in each mineral deposit in each separate tract or parcel of land. A special rule as to operating mineral interests is, however, added. This provides that a taxpayer who owns two or more separate operating mineral interests which constitute part or all of an operating unit may elect to form one aggregation and to treat any two or more interests as one property; and also to treat as a separate property each interest which he does not elect to include within the aggregation. The Treasury regulation, § 1.614–2, promulgated under this statute, provides that the term "operating unit" refers to a producing unit and not to an administrative or sales organization. The report of the House Committee on Ways and Means, 3 U.S.Code, Congressional and Administrative News, 1954, 83rd Congress, 2d Session, p. 4085, contains the following comments on the new statute:

> "Your committee has clarified the situation with respect to depletable properties by adding a statutory definition of 'the property.' This

812

provision adopts as the general rule the same definition relating to separate interests now established by regulations. In addition, however, the new provision permits a taxpayer to elect to treat as one property an aggregation of his separate operating mineral interest which constitute all or part of an operating unit.

\* \* \*

"The operating interests that may be combined into one property need not be included in a single tract of land or even in contiguous tracts, but they must be comprised in extractive operations which are normally or reasonably conducted as a unit."

Thus it seems that the Congressional interpretation of the former statute is in accord with that of the Tax Court in this case.

Affirmed.