Durfee, Judge,
delivered tbe opinion of tbe court:
Plaintiffs sue to recover overpayment of Federal income taxes for fiscal years ending March 31, 1951 and March 31, 1952. Tbe overpayment results from recomputation of the depletion allowance deduction on sand, gravel, and crushed stone quarries formerly owned by Bryan Eock and Sand Company, Inc. During prior tax years the depletion allowance was based upon the cost of the mined products. The Internal Eevenue Code was amended in 1951 to provide for a percentage depletion allowance deduction of five percent of the selling price of the sand, gravel, and stone.[2] The company filed its 1952 return with a percentage depletion deduction and was allowed to recompute its 1951 return, utilizing the percentage depletion for the period January 1 to March 31,1951, the last three months of that fiscal year.[3]
The controversy concerns the interpretation to be given the word “property” in section 114(b) (4) (A) (iv) of the Internal Eevenue Code of 1939. This subdivision provides that the depletion allowance
* * * shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, * * * [26U.S.C. (I.E.C. 1939) § 114(b) (4) (A) (iv)].
It is plaintiffs’ position that all of the mining property, the scattered parcels of land, must be gathered and treated as a single business unit; that this is the “property” for purposes of the 50 per centum limitation. Defendant contends that the separate and non-contiguous parcels of land in which the quarries have been dug, are to be treated individually; each *443 quarry is to be accorded a depletion allowance not to exceed 50 per centum of the net profit derived from that site. In 1951 and 1952 the Bryan Company owned 13 locations from which it mined and sold rock, sand, and gravel. Twelve were in North Carolina and one in Virginia. Except for two, they were all 20 miles or more apart.
The sole stockholders of Bryan Rock and Sand Company, Inc., during fiscal 1951 and 1952, were Mr. and Mrs. James E. Bryan. They later dissolved the corporation and formed a general partnership, each owning 50 percent of the operation. James E. Bryan subsequently died in 1953 and the business became a limited partnership, with Mr. Bryan’s estate owning 50 percent. After Mary Z. Bryan’s death in 1957, her half interest was taken over by her estate. The business has otherwise remained unchanged through these mutations in legal ownership. By stipulation during oral argument, counsel have agreed that the executors of the estates of James E. Bryan, deceased, and Mary Z. Bryan, deceased, each own 50 percent of this claim, and have the legal capacity to bring this suit.
This question of the proper interpretation to be given the word “property” has already been the subject of litigation and judgment between plaintiffs and defendant. The United States Court of Appeals for the Fourth Circuit has affirmed a decision of the Tax Court, holding that plaintiffs must determine a depletion allowance for each quarry separately. The mines may not be taken together to constitute a single property from which plaintiffs derive net income for purposes of the percentage depletion. Bryan's Estate v. Commissioner of Internal Revenue, 290 F. 2d 807 (4th Cir. 1961). The only differences in the proceeding before the Tax Court and the case at bar are these: the legal identity of the mining operators in 1952, the tax year involved (1954 in the Tax Court), and in that tax year plaintiffs owned three different quarries and did not operate four of the 13 quarries being mined in 1951 and 1952; nine quarries are common to each case. The first is a difference in form only, and the second and third variances are also without substance. It is not disputed that between 1951-1952 and 1954, there were no changes in the operation of the business or in the manner in *444 which it was conducted, (finding 16(d)). There is likewise no difference in the applicable statutory law and Treasury Regulations.
These circumstances would seem to compel the application of the doctrine of collateral estoppel, thereby preventing plaintiffs from relitigating the exact same issue. The issue was, and is, the proper interpretation to be given the same section of the Internal Revenue Code. The operation of the business is identical in all the tax years. All of plaintiffs’ mines were separate and non-contiguous in 1954, and the same was true in 1951-52.
However, plaintiffs rely on the fact that three new quarries were being operated in 1954, and four old sites were not, to avoid the proscription of collateral estoppel. The argument is well taken. Commissioner v. Sunnen, 333 U.S. 591 (1947), states:
* * * But if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. * * *
However, the Supreme Court states in the same paragraph:
* * * ln situation (as quoted above), a court is free in the second proceeding to make an independent examination of the legal matters at issue. It may then reach a different result or, if consistency in decision is considered just and desirable, reliance may be placed upon the ordinary rule of stare decisis. * * *
The suggestion of the Supreme Court to follow the ordinary rule of stare decisis is persuasive. Again, we have the same parties, the same issues, and identical but separable facts.
The Fourth Circuit has answered every argument put forward by plaintiffs in this case, and there is nothing in either proceeding which causes us to view the Circuit Court’s decision as unjust or undesirable. Accordingly, we have determined to follow the Bryan's Estate case, supra, and apply it as the rule in our case. Ben Construction Corporation v. United States, 160 Ct. Cl. 604, 312 F. 2d 781 (1963).
> has raised a¡s afilrmati-Yo defense fey way ef eff-pefej Including a deduction ef $6,570.74 taken fey the Bryan *445 - on its 49-52 return ■ 1 n -i -y-v^ ss /-n 4-/~\ n 3 WlililiilCCt W L/C to 1 tiffs? la view ef fte éisaassal eí fte ia¡dam heroin-; we seed set determino ft© merits eí fte offset claimed fey fte
it is fte judgment eí ftís eesst ftat defendant determined fte porcent-a-ge depletion allowance te wfeieh pla-infi-ffa wore entitled ea fte Fodoral income tas roturas fes fiscal years ending- fea 495-1- and 4952. The elaim fes a re-íund is ftereiere dcn-icd? ídafeafiffs are net entitled te rceoves; and fte petition is dismiosed.-
In view of tbe findings of the trial commissioner, with specific reference to findings 5, 6,7 and 12, plaintiffs should recover the overpayment of taxes paid for the year 1951 which is attributable to an understatement of its allowable depletion in the amount of $31,029.67, subject to an offset of taxes due the defendant which is attributable to the erroneous deductions of $450 and $18,433.56. Plaintiffs should also recover the overpayment of taxes for the year 1952 which is attributable to an understatement of depreciation in the amount of $5,556.18, a deduction in the amount of $32,249.99, and a deduction for depreciation on equipment purchased in 1952 for $4,800, subject to an offset of taxes due the defendant which is attributable to erroneous deductions of $1,100, $4,800, and $14,807.23.
Defendant has raised an affirmative defense by way of offset, pertaining to a deduction of $6,570.74 taken by the Bryan Company on its 1952 return for cost of construction of a dam claimed to be a promotional and advertising expense by plaintiffs, which is referred to in findings 17 through 20. As to this issue, plaintiffs are entitled to recover in accordance with the findings.
Plaintiffs are entitled to recover in accordance herewith and judgment is entered for plaintiffs to such extent, with the amount of recovery to be determined pursuant to Buie 38(c).
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
*446 1. (a) During the taxable years in issue (fiscal 1951 and fiscal 1952), plaintiff was a North Carolina corporation, with its principal office in Raleigh, engaged in the business of producing and selling aggregates (sand, gravel, and crushed stone).
(b) Plaintiff kept its books on the accrual basis of fiscal years ending March 31 and prepared and filed its income tax returns accordingly.
2. (a) On or about June 15, 1951, plaintiff filed with the Collector of Internal Revenue, at Greensboro, North Carolina (hereinafter Collector), its federal income tax return for the fiscal year ended March 31,1951, showing an income tax liability of $189,609.45, which was paid in quarterly installments in June, September, and December 1951, and April 29,1952.
(b) Said return included a deduction from gross income of $15,486.28 representing depletion of rock, sand, and gravel based upon cost.
(c) On June 15, 1954, plaintiff filed with the Collector a claim for refund in the amount of $20,240.22 for the fiscal year ended March 31,1951, based upon an additional deduction for depletion computed on percentage of sales instead of cost for the period January 1 to March 31,1951.
3. (a) For its fiscal year ended March 31, 1952, plaintiff timely filed' with the Collector its federal income tax return, showing an income tax liability of $384,611.25, which amount was paid in quarterly installments in June, September, and December 1952, and March 24,1953.
(b) In said return plaintiff failed to claim as a deduction from gross income the amount of $32,249.99, representing the net amount payable to the Collector as interest on net deficiencies in tax for prior years.
(c) On June 15, 1954, plaintiff filed with the Collector a claim for refund of income tax for the fiscal year ended March 31, 1952, in the amount of $16,769.99, based upon its failure to accrue and deduct the said interest of $32,249.99.
4. (a) Under date of November 26, 1956, the Collector[4] addressed to plaintiff a letter showing the result of an audit *447 of plaintiff’s claims for refunds of tax for fiscal 1951 and fiscal 1952, wherein he proposed, as to each of said claims, to allow part and to disallow part, on the basis of certain adjustments set forth in the letter.
(b) The adjustments proposed by the Collector were not acceptable to plaintiff.

Pleadings and, Issues

5. (a) The petition in this case was filed on March 8,1957,[5] seeking recovery of $37,010.21, consisting of $20,240.22 based upon additional deduction for depletion allowance for fiscal 1951, and $16,769.99 based upon the failure to accrue and deduct interest in fiscal 1952.
(b) Answer was filed May 7,1957, denying the validity of both claims and asserting as affirmative defenses by way of setoff certain of plaintiff’s deductions from gross income alleged to have been erroneous, as follows:
(1) For fiscal 1951, $18,433.56, representing “depreciation expense for six months on equipment located at its Puddle-dock Quarry which equipment it acquired only some six weeks prior to the end of its taxable year * *
(2) For fiscal 1951, $450, representing taxes on Puddle-dock Quarry which, defendant alleged, “had accrued on the Puddledock Quarry and were assessed against it prior to plaintiff’s acquisition of it.”
(3) For fiscal 1952, $14,807.25, representing “excessive” depletion allowance.
(4) For fiscal 1952, $1,100, representing contributions to donees which, defendant alleged, did not qualify as recipients of deductible gifts.
(5) For fiscal 1952, $4,800, deducted as the cost of equipment, when such cost properly represented a nondeductible capital expenditure.
(6) For fiscal 1952, $6,570.74, deducted as advertising and promotion expense, “whereas that expenditure, in fact, represented the cost of construction of a dam on the farm of Mr. J. E. Bryan.” (Mr. Bryan was one of the owners of plaintiff, and served as its president.)
*448 By way of summary of the foregoing, defendant’s affirmative defenses by way of setoff alleged erroneous deductions from gross income of $18,883.56 for fiscal 1951 and $27,277.99 for fiscal 1952.
The answer also denied plaintiff’s allegation that “* * * plaintiff is the sole owner of this claim, and has made no assignment or transfer of this claim or any part thereof.”
(c) On June 6, 1957, plaintiff filed a reply to defendant’s affirmative defenses wherein it admitted making the deductions as alleged; admitted error in so doing with respect to the deductions of $450 for taxes paid on the Puddledock Quarry and $4,800 for cost of equipment which should have been listed as a capital expenditure; and explained and asserted the validity of all other such deductions.
(d) On March 25, 1960, defendant filed its first amended answer wherein it asserted, as “a second affirmative defense,” that “plaintiff has no capacity to sue,” because plaintiff “was formally dissolved * * * on July 30,1953,” and—
Under the corporate laws of North Carolina, a dissolved corporation’s existence is continued for three years for the purpose of winding up its affairs. The instant action was filed on March 8, 1957, in excess of the three year period.
(e) On April 7,1960, plaintiff filed its reply to defendant’s first amended answer wherein it averred that plaintiff does have the capacity to sue “under Article 9, Section 55-114 of the Business Corporation Act (Chapter 55, General Statutes) of North Carolina, as amended to and including the year 1957 * *
(f) On March 21, 1961, plaintiff filed its amended reply to defendant’s first amended answer wherein it amplified its justification of the deduction of the cost of the dam on the Bryan farm “as constituting additional and reasonable compensation to its president, James E. Bryan.”
(g) On February 9, 1962, defendant filed its second amended answer wherein it added to its former pleadings “a third affirmative defense * * * that plaintiff is collaterally estopped from relitigating the issue involving the manner in which the limitation on percentage depletion is to be computed.”
*449 (h) On February 28, 1962, plaintiff filed its reply to defendant’s second amended answer, denying “that it is collaterally estopped * *
6. (a) By way of recapitulation: the pleadings joined issue on the two claims of plaintiff, raised three issues based on general defenses, and five issues based on affirmative defenses by way of setoff.
(b) The two issues based on the claims of plaintiff were:
(1) Allowable deductions for depletion, computed on the basis of percentage of sales.
(2) Allowable deduction of interest, omitted by reason of alleged oversight.
(c) The three issues of general defenses were:
(1) Ownership of the claim.
(2) Plaintiff’s capacity to sue.
(3) Collateral estoppel.
(d) The five issues of affirmative defenses by way of setoff were based on disallowance of the following deductions:
(1) Depreciation expense of $18,433.56 on equipment located at Puddledock Quarry.
(2) Taxes of $450 paid on Puddledock.
(3) Contributions, $1,100.
(4) Cost of equipment, $4,800.
(5) Cost of dam on Bryan farm, $6,570.74.
7. (a) Two of defendant’s affirmative defenses by way of setoff were admitted by plaintiff in its replies:
(1) Plaintiff admitted “that it erroneously deducted $450 as taxes for * * * [1951] which had accrued on Puddle-dock Quarry prior to plaintiff’s acquisition of it.”
(2) Plaintiff admitted that for 1952 it “erroneously deducted $4,800 which should have been capitalized instead of expanded.” [6]
(b) At the pretrial conference the parties agreed:
Plaintiff has alleged and defendant has admitted that in its 1952 return plaintiff failed to claim as a deduction from gross income the amount of $32,249.99 representing the net amount payable (and paid) as interest on net deficiencies in tax for prior years.
*450 Prior to March 31,1952, plaintiff bad admitted its liability for such interest, as determined by tbe Commissioner of Internal Revenue, and payment was made on July 17,1952.
The effect of the agreement at the pretrial conference, as quoted above, was to record defendant’s acceptance of plaintiff’s claim that the omission was inadvertent, and thereby to eliminate the issue from controversy.
(c) Prior to the closing of the evidence at the trial, plaintiff conceded error with respect to two additional affirmative defenses, thereby eliminating them from controversy:
(1) Excessive depreciation of equipment at Puddledock Quarry, $18,433.56, in the 1951 return.[7]
(2) Contributions, $1,100,1952 return.
8. There remain for adjudication the following issues:
(1) Plaintiff’s capacity to sue.
(2) Ownership of the claim.
(3) Computation of percentage depletion.
(4) Collateral estoppel.
(5) Cost of dam as a deduction.

Plaintiff's Capacity To Sue

9. (a) As heretofore noted[8] plaintiff was, during the taxable years in question, a North Carolina corporation.[9] Its ownership was equally divided between James E. Bryan and Mary Z. Bryan, husband and wife.
(b) On April 30, 1952, plaintiff corporation was completely liquidated. Its assets, remaining after payment of or provision for payment of all liabilities, were distributed in kind to its two stockholders.
*451 (c) On July 30, 1953, the plaintiff corporation was formally dissolved.[10]

Ownership of Qlaim,

10. (a) Effective May 1,1952, James E. Bryan and Mary Z. Bryan formed a general partnership, each owning a 50 percent interest, to conduct the business theretofore conducted by plaintiff. The claim presented by this suit was not carried on the books of the general partnership as an asset or otherwise.
(b) James E. Bryan died on February 5, 1953. Thereafter, and pursuant to a provision in his will, a limited partnership was formed to carry on the business, with Mary Z. Bryan as the general partner, owning 50 percent, and the First-Citizens Bank and Trust Company of Smithfield and Raleigh, North Carolina, executor of the Estate of James E. Bryan, as the limited partner, owning 50 percent. The claim presented by this suit was not carried on the books of the limited partnership as an asset or otherwise.
(c) The business was conducted by the limited partnership described in the preceding paragraph from the time of the formation of such partnership until the death of Mary Z. Bryan on July 9,195T.
(d) The executors of the Bryan Estates[11] each claim a 50 percent ownership of the claim presented by this suit, contending that the claim presented by this suit was among the assets distributed to James E. and Mary Z. Bryan upon the final liquidation of Bryan Rock and Sand Company, Inc. On the basis of the facts of record the contentions of the executors are valid. Ownership of the claim for refund presented by this suit passed from the corporation, upon its liquidation, to the stockholders, and from each of them, upon demise, to his or her executor.

Computation of Percentage Depletion

11. (a) In its income tax return for fiscal 1951, filed in June 1951, plaintiff set forth a deduction from gross income *452 of $15,486.28 representing depletion of rock, sand, and gravel based upon cost.[12] Thereafter, on October 21,1951, the 1951 Revenue Act was approved. Section 319(a) of that act amended section 114(b) (4) of the Internal Revenue Code of 1939 to provide for a percentage depletion deduction of 5 percent of the selling price of certain minerals, including sand, gravel, and stone, such amendment being applicable to taxable years beginning after December 31, 1950.
(b) Plaintiff’s taxable year ending March 31,1952, having begun on April 1, 1951, was a taxable year beginning after December 31, 1950. In its income tax return for fiscal 1952, plaintiff set forth a deduction from gross income representing depletion of rock, sand, and gravel, based upon 5 percent of the selling price of all sand, gravel, and stone from 12 quarries, treating them as a unit.
(c) On July 21, 1952, Public Law 594, 82d Congress, was approved.[13] It made the amendment set forth in paragraph (a) of this finding applicable to fiscal year returns for 1951 to the extent of the period January 1 to the end of the fiscal year. As applied to plaintiff, the amendment covered the period January 1 to March 31,1951.
(d) In its claim for refund of 1951 taxes, filed June 15, 1954,[14] plaintiff set forth a deduction from gross income reflecting an increase in the deduction theretofore claimed, based upon depletion computed as a percentage of the selling price of sand, gravel, and stone, from all quarries in operation during the period January 1 to March 31, 1951.
(e) Defendant, in answering plaintiff’s petition, set up as one of its affirmative defenses by way of setoff the contention that plaintiff’s depletion deduction for 1952 was excessive in the amount of $14,801.25.[15] The basis of this contention is that depletion deductions properly allowable should have been based upon separate schedules from individual quarries rather than on combined sales from all of the quarries in operation.
*453 12. (a) Section 114(b) (4) (A) of the Internal Revenue Code of 1939, as amended, contained the following limitation:
* * * Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property * * *.
The issue which divides the parties in this action is the proper definition of “the property.” Plaintiff contends that “the property” refers to the quarries as a whole, while defendant contends that each separate quarry is “the property” for purposes of computation.[16]
(b) The parties have agreed that (1) if plaintiff’s position is correct, it is entitled to a deduction from gross income for fiscal 1951 of $49,568.19, representing 5 percent of its sales for the period January 1 to March 31, 1951 (on the basis of which the additional deduction for fiscal 1951 would be $45,238.73); while (2) if defendant’s position is correct, plaintiff must be limited to the additional deduction of $31,-029.67, as computed by the examining agent.
(c) Similarly, for the fiscal year ended March 31, 1952, the parties have agreed that (1) if plaintiff’s position is correct, it is entitled to a deduction for depletion of $207,318.88;[17] while (2) if defendant’s position is correct, the amount of depletion to be disallowed would be $14,807.23.[18]
13. (a) During the taxable years in question plaintiff owned 13 quarries as listed below, being 12 quarries in 8 counties in North Carolina, and 1 in Virginia.

*454
Quarry Location

Aberdeen_Aberdeen, North. Carolina
Buggs Island_Near Buggs Island Dam
Garysburg_Garysburg, North Carolina
Goldsboro_Goldsboro, North Carolina
Lillington_Lillingfcon, North Carolina
Linden_Linden, North Carolina
Neverson_Zebulon, North Carolina
Puddledock-Prince George, Virginia
Bockton_Wake County, North Carolina
Bolesville_ Bolesville, North Carolina
Shelton_Near Buggs Island Dam
West End_Wilson, North Carolina
Woodleaf_Woodleaf, North Carolina
(b) Puddledock (the Virginia quarry) was acquired in 1951. The Linden quarry was acquired in 1948. All others were acquired prior to 1948.
(c) None of the quarries is contiguous to another, although the two properties near to Buggs Island Dam are near to each other. Excepting those two, the quarries are 20 miles or more apart from each other. Aberdeen and Puddledock are separated by 225 miles.
(d) All of the quarries listed in paragraph (a) of this finding were operated by plaintiff in 1951 with the exception of Bockton. In 1952, Bockton was in operation, hut Buggs Island, Shelton, and Woodleaf were not.
14. (a) Insofar as practical, plaintiff operated the several, separate quarries as a business unit. A central control office was maintained in Baleigh for the conduct of the business. All books and records were maintained in the central office. Information for all tax returns was assembled and maintained there. Becords of sales, direct mining costs, and depreciation accounts of large machinery were kept on an individual quarry basis, in books at the central office. General and administrative expense records were maintained on a combined basis, with no allocation among the quarries.[19]
*455 (b) Plaintiff’s salesmen designated specific quarries in sales orders as the sources from which to make deliveries of sand, rock, or gravel. The specification was made on the basis of the quarry closest to the customer, whence deliveries could be made at the lowest cost. While orders were usually filled by deliveries so designated, the salesman’s designation was not controlling, and orders were occasionally filled from other (sometimes several) quarries, if economy so dictated.
(c) Equipment and personnel were moved between the various quarries as necessary. No specific records of these transfers of men or machinery were kept. Plaintiff maintained its principal equipment repair shops at the Rolesville and Puddledock quarries. While most major repairs were handled at those shops, repair crews were sometimes dispatched from the shops to the site of large or heavy pieces of equipment. The cost of major repairs was charged to the shop (at Rolesville or Puddledock) in each instance, and not to the quarry where the machine was in operation.
(d) Carloads of steel or other materials to be used in various mining operations were purchased by plaintiff and billed to the individual quarry at which the materials were delivered. Such materials would thereafter be dispensed to other quarries as the need arose.
15. (a) There were economic advantages to plaintiff (1) in owning several quarries,[20] (2) in having them at scattered locations,[21] and (3) in operating them as a unit insofar as possible.[22]
(b) Physically, any one of the quarries could have been operated as a unit, separate and apart from the others, just *456 as any of the quarries could have been operated manually, by pick and shovel, without the use of machinery. There is no evidence that plaintiff or any prior owner ever operated any one quarry as a separate unit. Under the circumstances, it is not established by the evidence that such separate operation, if undertaken, would have resulted in profit or loss.[23]

Previous Litigation

16. (a) On May 31,1961, the United States Court of Appeals, Fourth Circuit, in the case of the Estate of James E. Bryan, Deceased, et al. v. Commissioner of Internal Revenue,[24] proceeding on a petition to review a Tax Court decision, held that:
* * * depletion allowance was properly computed separately for each of taxpayers’ separate, noncontiguous quarry properties, although taxpayers conducted enterprise as single unit.[25]
(b) The taxpayers in that proceeding were the executors of the estates of James E. Bryan and Mary Z. Bryan.[26] The business was the business formerly operated by plaintiff. During the taxable year in question in the Tax Court proceeding (February 5,1953, to January 31,1954), the business was operated by the limited partnership described in finding 10(b).
*457 (c) The quarries in operation by the business during the taxable year included 9 of the 13 quarries listed in finding 13(a) and 3 quarries not so listed. Exe-luded from the listing of finding 13(a) were Buggs Island, Lillington, Shelton, and Woodleaf. The three quarries not previously listed were Crabtree Creek, Graystone, and Margarettsville. In 1954, Graystone was the largest quarry owned by the business, and Crabtree Creek was about two-thirds as large.
(d) Between 1951-1952 and 1954, there were no substantial changes in the operation of the business or in the manner in which it was conducted.

Cost of Dam

17. As noted in finding 5 (b) (6), defendant has challenged the validity of plaintiff’s deduction, in its 1952 return, of $6,570.74, representing the cost of constructing a dam on the farm of Mr. James E. Bryan. The figure representing the cost of the dam is not in dispute. Defendant challenged the deduction of such cost as “advertising and promotion expense.” Plaintiff, in its amended reply filed March 21, 1961,[27] asserted in further justification of the deduction that the cost of the dam constituted “additional and reasonable compensation to its president, James E. Bryan.”[28]
18. (a) Prior to the construction of the dam on the Bryan farm, plaintiff had owned property near Raleigh, consisting of 150 acres of land with a small log cabin on it and a pond of some 10 acres. This property was used by plaintiff for promotional or recreation purposes. It was given the name of Bock-em-Inn. Employees of plaintiff used it for fishing and for parties, and plaintiff used it to some extent for entertaining highway employees and prospective customers.
(b) The property described in the preceding paragraph was sold in 1950 or 1951, primarily because plaintiff was unable satisfactorily to control its use.[29]
19. (a) The Bryan farm also consisted of about 150 acres, and was located near Raleigh. There was a pond of some *458 2 acres on tbe farm, which, was used primarily for watering livestock.
(b) The dam in question was built in the same ravine as the 2-acre pond, and was so designed as to provide another and larger pond of some 9 or 10 acres. Access to the two ponds, by automobile, could be had only by driving to or past the Bryan home.
(c) Plaintiff paid for the construction, which was completed in 1951 or 1952. Due to some fault in design or some unknown underground condition, ponding back of the dam was slow. The pond had not completely filled by the time of Mr. Bryan’s death in February 1953. While it did eventually fill, it was not used for promotional or recreation purposes by the limited partnership which succeeded the general partnership of Mr. and Mrs. Bryan.
20. (a) The evidence on which defendant relies in support of its challenge shows that (1) it was (and is) common practice in the area for dams to be built to form ponds which are used in aid of farming (minor irrigation), grazing (watering livestock), fire protection of buildings, and recreation (swimming, boating, and fishing); (2) at the time Mr. Bryan decided to sell the other property (Rock-em-Inn) and to build another pond on his home place, he was considering the sale of the business operated by plaintiff, and to expand his land holding as the base of a larger operation in raising cattle; (3) sale of the business operated by plaintiff, as indicated in the preceding clause, was still under consideration by Mr. and Mrs. Bryan while the dam was under construction and until shortly before the time of plaintiff’s liquidation; (4) the pond was never put in use by plaintiff; and (5) there is no showing of what disposition or use of the pond was contemplated by Mr. and Mrs. Bryan after the liquidation of plaintiff.
(b) The evidence on which plaintiff relies in support of the validity of the deduction as an item of advertising and promotional expense shows that (1) the cost of constructing the dam was paid by plaintiff; (2) deduction of the cost from gross income was claimed by plaintiff as advertising and promotional expense; (3) plaintiff’s general manager understood from Mr. and Mrs. Bryan (i) that the purpose *459 of the dam (and resulting pond) was to provide recreational facilities in substitution for Bock-em-Inn; (ii) that Mr. Bryan preferred to have the facilities on his home place where persons using them could be seen and identified; and (iii) that Mrs. Bryan, who was to do the watching, was at first reluctant to enter into the supervisory undertaking, but ultimately agreed with her husband to do so; (4) no firm decision to sell plaintiff’s business was ever reached by the Bryans, and at the time of the liquidation of plaintiff, negotiations had been abandoned on the last and only pending proposition for sale; and (5) the facilities were never fully ready for use prior to Mr. Bryan’s death.
(c) On the evidence as a whole it is concluded that the cost of constructing the dam was incurred by plaintiff as promotional and advertising expense.
CONCLUSION OF LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are set entitled to recover,' and the petition Is dismissed; are entitled to recover in accordance with the opinion, with the amount of recovery to be determined pursuant to Rule 38(c).
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amounts due thereunder, it was ordered on January 17, 1964, that judgment be entered for plaintiff Byron E. Bryan, Executor of the Estate of Mary Z. Bryan, deceased, for $2,626.89 for 1951, and for $4,582.25 for 1952, with interest as provided by law; and for plaintiff First-Citizens Bank and Trust Company of Smithfield and Baleigh, North Carolina, Executor of the Estate of James E. Bryan, deceased, for $2,626.89 for 1951, and for $4,582.25 for 1952, together with interest as provided by law.

 Section 319(a) of tbe 1951 Revenue Act, approved October 20, 1951, 65 Stat. 497, amended section 114(b)(4) of tbe Internal Eevenue Code of 1939.

 Public Law 594, 82d Cong., approved July 21, 1952, 66 Stat. 820, permitted tbe company to amend its 1951 return.

 The title of “Collector” had then been changed to District Director of Internal Revenue.

 More than 6 months had then elapsed since the claims for refund had been filed, but no final action had been taken thereon.

 At the pretrial conference the parties agreed that: “Plaintiff now alleges and defendant admits that plaintiff is entitled to claim depreciation on the equipment purchased with such capital expenditure.”

 The parties have further agreed that the overstatement of such depreciation by $18,433.56 in 1951 resulted in an understatement of such depreciation by $5,556.18 in 1952.

 Finding 1(a).

 In their separate! reguests for findings of fact, the opening sentence of each of the parties recites that “at all times material” the plaintiff was a corporation. The parties’ initial Stipulation of Facts, filed March 15, 1961, stated that: “In April, 1951, the plaintiff was incorporated as a North Carolina corporation * * On April 17, 1962, the parties filed their Stipulation to Correct Stipulation of Facts, changing the opening sentence to read: “At all times material * * *” etc. The amended language conforms to the initial pleadings. The petition alleged, and the answer admitted, that “at all times material * * * the plaintiff was a * * * corporation * * The issue as to plaintiff’s capacity to sue was raised by defendant’s first amended answer, through its second affirmative defense.

 The dissolution occurred more than S years prior to the filing of the petition on March 8, 1957.

 Bor the Estate of James E. Bryan, the First-Citizens Bank and Trust Company. For the Estate ofi Mary Z. Bryan, Byron B. Bryan.

 Finding 2(b).

 66 Stat. 820.

 Fllnding 2(c).

 Finding 5(b)i(8).

 The Internal Revenue agent who examined plaintiff’s returns made the computations on each quarry separately, The results of his examination, Including his computations, were set forth In an exhibit (Exhibit B) attached to the Collector’s letter of November 28, 1956, mentioned in finding 4(a).

 The amount claimed by plaintiff in its 1952 return was $208,874.38, which exceeds the agreed allowance by $1,555.50. This excess would be disallowed.

 under this computation the allowable deduction would be $1,94,067.15. It thus appears that the amount at issue between the parties is $13,251.73.

 In order to arrive at a computation of net income for each quarry, the Internal Revenue agent derived a percentage ratio by dividing tbe totals of general and administrative expense by the combined total of sales. He then applied this percentage to revenues from separate quarries to ascertain the amount of general and administrative expense allocable thereto. He derived net income for each quarry by deducting allocated expense from revenue. These computations reflected his own analyses. Plaintiff maintained no comparable analyses.

 Division of properties among sandpits and stone quarries provided greater flexibility. Nor example, the paving of a highway between Raleigh and Durham required both stone and sand. One of plaintiff’s rock quarries was very near the construction site. By supplying stone from this quarry, plaintiff was able to supply sand from a pit 40 miles away and to show a profit on the contract overall. On another contract, near Roanoke Rapids, the proximity of a sand pit enabled plaintiff to bid in the stone supply from a more distant quarry.

 The ownership of quarries at scattered locations extended the area within which plaintiff could successfully compete. Concentration on one stone quarry or one sandpit, or on one property for both sand and stone, no matter how ample the supply, would have restricted plaintiff’s field of operations to territory reasonably accessible in terms of transportation expense. Scattered locations opened extensively wider markets.

 Central office management, control, and records afforded obvious economies over the maintenance of separate offices, staffs, and sales forces.

 The general manager of plaintiff’s business, responding to counsel’s question as to whether it would have been profitable to operate each quarry as a separate unit, replied: “Overall, no; in some instances we probably would have shown a profit, but overall we wouldn’t have; if you consider all the quarries over a period of time they would have all have sustained some loss.”

 290 E. 2d 807.

 The court said (p. 809) : “The Tax Court found that although the quarries were operated as a single unit in order to meet competition more effectively it was possible to operate each quarry separately at a profit * * (Emphasis supplied.) The transcript of testimony before the Tax Court is in evidence in this case. Taken, as a whole, the evidence in this case does not warrant a finding that it was possible to operate each quarry separately at a profit.
Defendant resisted plaintiff’s effort to establish this difference in findings of fact between the Tax Court and the Court of Claims on the ground that the Court of Appeals further said (p. 810, fn. 1) : “* * * the success of the several operations has little bearing on the proper interpretation of the statute.” In this connection it may be noted that the essence of the Court of Appeals decision consists of an analysis of the Treasury Regulations and their relation to statutory interpretation, quite independently of “the success of the several operations.”

 Of. finding 10 (b) and (d).

 Finding 5(f).

 No evidence was offered in support of this justification.

 Although the property was fenced with barbed wire, unauthorized persons obtained entry and used the pond for boating, swimming, and fishing.